878 So.2d 808 (2004)
Lynn S. BOLAND and Her Children, Monique Elizabeth Fox and Margeaux Lynn Fox
v.
WEST FELICIANA PARISH POLICE JURY, Coregis Insurance Company, Branco, Inc., John Brandt, and Norris Decoteau.
No. 2003 CA 1297.
Court of Appeal of Louisiana, First Circuit.
June 25, 2004.
Rehearing Denied August 18, 2004.
*811 William D. Grimley, Baton Rouge, for Plaintiffs-Appellants Lynn S. Boland, et al.
John David Ziober, Kennon, Odom & Dardenne, L.L.C., Baton Rouge, for Defendants-Appellees West Feliciana Parish Police Jury and Coregis Insurance Co.
Michael O. Hesse, Hesse & Butterworth, St. Francisville, for Defendant-Appellee Norris Decoteau.
John P. Wolff, III, Baton Rouge, for Defendants Branco, Inc., John Brandt, and Transportation Insurance Co.
Before: CARTER, C.J., PARRO, and GUIDRY, JJ.
PARRO, J.
Lynn S. Boland,[1] who was injured in a fall from a rural bridge while attempting to ride her bicycle across it, appeals a judgment granting summary judgments in favor of the West Feliciana Parish Police Jury (the parish), its insurer, Coregis Insurance Company (Coregis), and Norris Decoteau,[2] and dismissing her claims against them.[3] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Boland was a proficient cyclist who began riding road bicycles in 1983, rode an average of 100 to 150 miles each week, participated in numerous races, and frequently won cycling competitions she entered. On August 5, 2000, Boland was riding with a group of about seventeen other cyclists on Island Road in West Feliciana Parish, along a route that took them over the Williams Creek bridge. Island Road is a rural, one-lane, parish road used as access for local residents and for timber, sand, and gravel hauling. After washing out several times, the Williams Creek bridge was completely rebuilt in 1999: its deck was constructed from the beds of railroad cars; the surface was covered with crushed limestone aggregate; and metal guardrails were placed on each side. Boland was familiar with the road and the bridge, having cycled this route several times before without incident. As she approached the bridge, Boland reduced her speed to 10-15 miles per hour and directed her bicycle toward the "wheel track" on the right side of the bridge. Shortly after she encountered the surface of the bridge, her rear wheel began sliding. She attempted to pedal and steer out of the skid, but could not regain control. The bicycle continued to fishtail and, within seconds, it leaned to the left and hit the metal railing on the left side of the bridge. Unable to right herself or dismount,[4] Boland and the *812 bicycle fell over the left side of the bridge into the dry creek bed about twenty feet below. The other cyclists in the group, many of whom were riding ahead of her, crossed the bridge without incident.
Boland was severely injured and allegedly has some permanent disabilities due to this accident. She and her daughters sued the parish, Coregis, Decoteau, Branco, Inc. (Branco), and Branco's owner, John Brandt,[5] claiming damages for Boland's medical expenses, mental and physical pain and suffering, past and future wage losses, and loss of enjoyment of life, as well as her daughters' consortium losses. Boland stated in her original and supplemental petitions that the cause of her accident was the negligent design and construction of the bridge, in that it was narrower than the dimensions of the roadway; was surfaced with gravel instead of a solid surface; had gravel stacked up near the railing, thus "raising users of the bridge higher above the railing"; had a railing of substandard height; and had a surface that was inconsistent with the adjoining roadway surfaces. She claimed the parish owned and constructed the bridge or contracted to have it constructed; that Coregis insured the parish; that Branco and Brandt constructed the bridge according to plans they designed or plans provided by the parish and/or its engineer, Decoteau; that Branco and Brandt were insured by Transportation; and that the defendants were jointly and solidarily liable for her damages.
Eventually, Boland filed a motion for summary judgment against all the defendants on the issue of liability. Decoteau and the parish defendants[6] filed cross-motions for summary judgment. After a hearing concerning only the motions filed by Boland and the parish defendants, the court denied both motions on December 11, 2002. This judgment was not appealed. The parish defendants re-urged their motion, emphasizing that LSA-R.S. 9:2800 was applicable to the claims against the parish and had not been considered by the court.[7] Another hearing was held, at which the court heard arguments concerning Decoteau's and the parish defendants' motions for summary judgment. Following the hearing, the court granted their motions and dismissed Boland's and her daughters' claims against them. This appeal followed.

SUMMARY JUDGMENT
An appellate court reviews a district court's decision to grant a motion for summary judgment de novo, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. West v. Clarendon Nat'l Ins. Co., 99-1687 (La.App. 1st Cir.7/31/00), 767 So.2d 877, 879. The motion should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B); Johnson v. Evan Hall Sugar Co-op., Inc., *813 01-2956 (La.App. 1st Cir.12/30/02), 836 So.2d 484, 486.
On a motion for summary judgment, if the moving party will not bear the burden of proof at trial on the matter before the court on the motion, the moving party must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact and summary judgment must be granted. LSA-C.C.P. art. 966(C)(2); McGee v. State ex rel. DOTD, 00-2706 (La.App. 1st Cir.3/28/02), 813 So.2d 625, 628. Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Davis v. Specialty Diving, Inc., 98-0458 and 98-0459 (La.App. 1st Cir.4/1/99), 740 So.2d 666, 669, writ denied, 99-1852 (La.10/8/99), 750 So.2d 972.
A trial judge cannot make credibility determinations on a motion for summary judgment. A party seeking a summary judgment is entitled to a favorable judgment only if there is no genuine issue as to a material fact. LSA-C.C.P. art. 966(B). The credibility of a witness is a question of fact. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). In deciding a motion for summary judgment, the court must assume that all of the affiants are credible. Hutchinson v. Knights of Columbus, Council No. 5747, 03-1533 (La.2/20/04), 866 So.2d 228, 234.

MOTION TO STRIKE
The parish defendants moved this court to strike a number of Boland's exhibits that were attached to the memorandum in support of her motion for summary judgment, alleging that because they were not attached to or adopted by reference in the motion and were not separately introduced at the hearing, they were not properly part of the record at the district court and should not be considered by this court. The memorandum and attached exhibits were referenced in Boland's motion with the statement, "as explained in the accompanying memorandum and exhibits," and were filed in the record at the district court, along with the motion and memorandum.
Article 967 of the Louisiana Code of Civil Procedure describes the type of documentation a party may submit in support of or in opposition to a motion for summary judgment. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/00), 755 So.2d 226, 231. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts that would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits. LSA-C.C.P. art. 967. A document that is not an affidavit or sworn to in any way, or is not certified or attached to an affidavit, is not of sufficient evidentiary quality on summary judgment to be given weight in determining whether or not there remain genuine issues of material fact. Sanders v. J. Ray McDermott, Inc., 03-0064 (La.App. 1st Cir.11/7/03), 867 So.2d 771, 775.
If the other criteria of Article 967 are met, evidence submitted as attachments to the memorandum in support of or in opposition to the motion for summary *814 judgment may properly be considered by the court. Aydell v. Sterns, 98-3135 (La.2/26/99), 731 So.2d 189, 189. Affidavits in support of or in opposition to motions for summary judgment must be filed into evidence at the hearing on the motion or filed into the record in order for the affidavits to be part of the record on appeal. See LSA-C.C.P. art. 966; Hopper v. Crown, 560 So.2d 890, 892 (La.App. 1st Cir.1990). An affidavit filed into the record as part of the support for or opposition to a motion for summary judgment is part of the record on appeal, which the court of appeal may consider. See Hutchinson, 866 So.2d at 232. Although Articles 966 and 967 do not permit a party to use unsworn and unverified documents as summary judgment evidence, if both parties offer identical copies of documents, indicating that there is agreement between them as to their authenticity, the court may accept them. Harvey v. Francis, 00-1268 (La.App. 4th Cir.3/21/01), 785 So.2d 893, 896.[8]
Citing Aydell, supra, Boland asserts that all the documents attached to her memorandum and filed in the record were properly "on file" for purposes of her opposition to the defendants' motions for summary judgment. In Aydell, the supreme court stated the court of appeal erred in holding that the district court could not rely on the evidence submitted by the defendant in support of its motion for summary judgment, simply because the affidavits and depositions were attached to the memorandum in support of the motion, rather than to the motion itself. Aydell, 731 So.2d at 189-90. The case was remanded to the court of appeal to consider this evidence. In an even more recent statement on this issue, the supreme court emphasized the words, "on file," in Article 966(B), and stated that as long as an affidavit opposing the motion for summary judgment was filed in the record, it could be considered by the court. Hutchinson, 866 So.2d at 232.
Taking our cue from the supreme court's statements in Aydell and Hutchinson, we conclude that as long as affidavits and depositions are filed in the record in connection with a motion for summary judgment, they may be considered by the district court and this court, whether filed with the motion or a memorandum. However, we note that those cases dealt only with affidavits and depositions, which are specifically described as admissible in Articles 966 and 967 of the Code of Civil Procedure; neither case addressed the admissibility of other documents. We do not consider those cases as suggesting that "anything goes," as long as it is stapled or paper-clipped to a motion or memorandum, is referred to in one of those documents, and is filed in the record.
Using the criteria in Articles 966 and 967 to evaluate the parish defendants' motion to strike, we note the following. The parish defendants seek to strike photographs of the bridge and the bicycle, which were attached to Boland's memorandum; yet they submitted those same photographs in connection with Boland's deposition, which was attached to their motion for summary judgment. Therefore, the authenticity of the photographs is admitted. Furthermore, as attachments to Boland's deposition that were identified, verified, and referred to in the deposition, the photographs were admissible on that basis also. All of the affidavits to which the parish defendants object meet the criteria *815 of Article 967, were filed in the record, and were properly considered. Excerpts from various depositions were filed in the record by both parties; all are admissible under Article 966(B). Although the parish defendants objected to Professional Engineering Consultants Corporation (PEC)[9] Project Observation Report No. 2 and to the minutes of the parish police jury meeting of April 13, 1999,[10] they also submitted those same documents in support of their motion, thus conceding their authenticity and allowing them to be considered.
The following documents were unsworn, unverified, not admitted by both parties, and not attached to any affidavit or deposition, and therefore, were not admissible: (1) contracts dated January 1999 and March 1999 between the parish and PEC; (2) contract change orders of September 15, 1999, and October 27, 1999; (3) a letter dated June 7, 1999; (4) PEC Project Observation Report No. 5; (5) an Application to the Governor's Office of Rural Development;[11] (6) a request for payment dated November 8, 1999; (7) parish Budget Message of November 24, 1998; and (8) a contract between Tangipahoa Parish and Branco, Inc. concerning a different project.
In addition, the parish defendants moved to strike portions of Boland's brief that refer to an excerpt from a transcription of an audio cassette tape recording of the April 13, 1999 meeting of the police jury. Neither this transcript nor the tape recording are in the record. Accordingly, those references will be stricken.
Therefore, the motion to strike is granted in part and denied in part, in accordance with the foregoing discussion.

LIABILITY OF DECOTEAU
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of Louisiana Civil Code article 2315. For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damage element). Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 La.4/3/02), 816 So.2d 270, 275-76; Racca v. St. Mary Sugar Coop., Inc., 02-1766 (La.App. 1st Cir.2/23/04), 872 So.2d 1117, 1122, writ denied, 04-0698 (La.5/7/04), 872 So.2d 1083.
Duty is a question of law. Simply put, the inquiry is whether a plaintiff has any law  statutory, jurisprudential, or arising from general principles of fault  to support his or her claim. Bowman *816 v. City of Baton Rouge/Parish of East Baton Rouge, 02-1376 (La.App. 1st Cir.5/9/03), 849 So.2d 622, 627, writ denied, 03-1579 (La.10/3/03), 855 So.2d 315. Where no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. Griffin v. Shelter Ins. Co., 02-2628 (La.App. 1st Cir.9/26/03), 857 So.2d 603, 605, writ denied, 03-2992 (La.1/16/04), 864 So.2d 635.
Boland's claims against Decoteau were based on his position as a consulting engineer for the parish before and during the bridge construction. She claimed his plans were used to construct the bridge, and he advised Branco and the parish during the construction process; therefore, he could be held responsible for defects in its design and construction.
Decoteau claimed he had a very limited role in advising the parish on an "as needed" basis concerning specific aspects of the Williams Creek bridge project. He reviewed the "rail car" bridge plans, which were prepared by another engineer and given to him by Branco; he obtained a third bid after the specifications had been established; and he made load limit calculations on the completed bridge. Decoteau contended his duties did not include any design, construction, supervision of construction, or maintenance of the bridge. Decoteau supported his motion with his own affidavit and deposition and with Brandt's deposition. Decoteau said that if he had seen something that he thought was detrimental to the public, he certainly would have reported that condition, but he did not have general oversight over the project. He did no measurements of rail heights or other aspects of the bridge that did not affect the load limits. Decoteau said the parish did not ask him to do anything concerning the construction of the bridge except the structural examination to determine load limits. Brandt confirmed this limited involvement of Decoteau and clarified that the plans for the "rail car" bridge design had been drawn and provided to his company years earlier by a different engineer.
The only opposition consisted of comments by former parish manager, Norman E. "Pete" Heine,[12] referring to Decoteau in his deposition as the parish's "engineer on the job," and saying he relied on Decoteau to review the bridge plans and construction and tell him of anything that might be a problem. However, Heine did not describe any specific duties conflicting with Decoteau's or Brandt's description of what Decoteau actually did with reference to the project.
In written reasons for judgment, the district court stated the following concerning Decoteau:
Norris [Decoteau] was initially contacted by the Parish Manager, Pete Heine, who asked him to travel to the Covington and Tangipahoa Parish area to look at several of Branco, Inc.'s "rail car" bridges which the Parish Manager was interested in using for creek bridges in West Feliciana Parish. After viewing other bridges of the type[,] the Parish Manager decided they were suitable for use in the Parish of West Feliciana. The Parish then contracted with Norris [Decoteau], who is an engineer and surveyor, to survey the proposed areas of construction and perform a hydraulic study to determine the most feasible location for each of the proposed *817 bridges. [Decoteau] performed a hydraulic/surveying study, assisted the Parish in finding a third bidder for competitive bids with Branco and one other bidder, and made a determination that the support pieces for the bridge were big enough to support load limits which he set in accordance with current engineering standards. [Decoteau] had nothing to do with maintenance, supervision of construction, or design of the bridge in question. The court finds that none of the engineering or surveying work performed by [Decoteau] had anything to do with the accident[,] and the arguments of counsel, pleadings, discovery and supporting affidavits establish no genuine issue of material fact. [Decoteau] is therefore entitled to summary judgment as a matter of law.
These written reasons accurately summarize the evidence, and our de novo review of the record has not revealed anything in Boland's or the parish defendants' submissions that would create a genuine issue of material fact concerning Decoteau's involvement with the design, construction, or maintenance of the bridge, such that liability could be imposed on him for this accident. Boland did not establish that any of Decoteau's duties affected the bridge conditions that allegedly caused her accident. Therefore, she failed to provide factual support sufficient to establish that she would be able to satisfy her evidentiary burden of proof at trial that Decoteau had a duty to her that was breached and/or that any of his actions or inactions were a cause-in-fact of her accident. Accordingly, the district court did not err in dismissing Boland's claims against Decoteau on summary judgment.

LIABILITY OF THE PARISH
When the claim against a public entity is based on the condition of property, a plaintiff may proceed under theories of negligence or strict liability. Louisiana Revised Statute 9:2800 governs strict liability claims against a public entity under LSA-C.C. art. 2317, but limits that liability by requiring proof that the public entity had actual or constructive knowledge of the defect and a reasonable opportunity to remedy the defect, yet failed to do so. Henderson v. Nissan Motor Corp., 03-606 (La.2/6/04), 869 So.2d 62, 66. The imposition of liability under general negligence principles requires proof that the defendant had actual or constructive knowledge of the risks and failed to take corrective action within a reasonable time. Hardenstein v. Cook Constr., Inc., 96-0829 (La.App. 1st Cir.2/14/97), 691 So.2d 177, 183, writ denied, 97-0686 (La.4/25/97), 692 So.2d 1093. Therefore, under either negligence or strict liability, for a plaintiff to succeed in an action against a public entity based on the condition of property for which it allegedly had responsibility, the plaintiff must show that (1) the property causing the damage was in the custody of the public entity; (2) the property was defective due to a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the risk; and (4) the defect was a cause-in-fact of the plaintiff's injury. See Toston v. Pardon, 03-1747 (La.4/23/04), 874 So.2d 791, 798.
Any political subdivision of the state has a duty to maintain, repair, construct, or reconstruct any public road, highway, bridge, or street, or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver. LSA-R.S. 48:35(F)(1)(a). Design standards, both at the time of original construction and at the time of the accident, may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm, but are not determinative of the issue. Thornhill *818 v. State Dep't of Transp. & Dev., 95-1946, 95-1947, 95-1948, 95-1949, and 95-1950 (La.App. 1st Cir.6/28/96), 676 So.2d 799, 804, writs denied sub nom. Riley v. State Through Dep't of Transp. & Dev., 96-2014 and 96-2021 (La.11/8/96), 683 So.2d 272.
Defendants generally have no duty to protect against an open and obvious hazard. If the facts of a particular case show that the complained-of condition of a thing should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. Pitre v. Louisiana Tech Univ., 95-1466, 95-1487 (La.5/10/96), 673 So.2d 585, 591, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996).. The degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous. Hutchinson, 866 So.2d at 235. Whether a condition of a thing is unreasonably dangerous requires consideration of: (1) the utility of the thing; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the complained-of condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activity in terms of the activity's social utility or whether the activity is dangerous by nature. Id. at 235.
To meet the burden of proof on their motion for summary judgment, the parish defendants had to demonstrate a lack of factual support for some element of Boland's claim. Custody and ownership of the bridge were not contested; the parish defendants directed their arguments on the motion to whether the bridge was defective due to a condition that created an unreasonable risk of harm, and whether the parish knew of the risk.[13]
Boland's main contentions concerning the hazardous condition of the bridge involve the surface material[14] and the height of the railings. She claims the crushed limestone aggregate presented an uneven and unstable surface that caused her bicycle tires to skid, and that the parish created this condition by failing to overlay the bridge with a hard surface when it had the bridge constructed and/or when the adjoining road surface was subsequently overlaid. Boland also claims the railing was too low, partly because it was designed improperly, but also because the gravel on the bridge could shift toward the sides and pile up there. As a result, when her bicycle neared the railing, its tires would be several inches higher than when she was in the center of the bridge, thus reducing the relative height of the railing and eliminating its effectiveness as a barricade. She contends this combination of factors constituted an unreasonably hazardous condition. Boland also insists liability in this case is based on the parish's failure to comply with LSA-R.S. 48:35, under which she alleges the parish has a duty to design and construct roads and bridges within its purview according to AASHTO standards.
Boland's first contention on appeal is that, because her claim is not based on strict liability, the knowledge requirements of LSA-R.S. 9:2800 have no application. *819 The argument overlooks the fact that, whether pleading simple negligence or applying 9:2800, the plaintiff must prove the same elements in order to impose liability on a public entity when the claim involves an allegedly defective condition of public property. Under either theory, Boland bears the burden of proof at trial that the bridge was in the custody of the parish, that it was defective due to a condition that created an unreasonable risk of harm, that the parish had actual or constructive knowledge of the risk, and that the defect was a cause-in-fact of her injury. See Bessard v. State, Dep't of Transp. & Dev., 94-0589 (La.11/30/94), 645 So.2d 1134, 1136.
The parish admitted in its answer to Boland's petition that it owned the Williams Creek bridge where this accident occurred and that it contracted to have the bridge installed. Based on these facts, Boland contends that, because the parish constructed the bridge, thereby creating the defective condition, its actual knowledge is presumed. This argument begs the question by assuming that some aspect of the design or construction of the bridge was unreasonably hazardous ab initio.[15] Additionally, the parish points out that, though it contracted with Branco to have the bridge constructed according to plans supplied by Branco, neither the parish nor any of its own employees designed or constructed the bridge, such that the parish would have actual notice of anything that may have been done incorrectly.[16] Boland presented no evidence to the contrary. Therefore, despite these arguments, the parish's actual or constructive knowledge of the risk remains an element of her cause of action that must be proved.
To support their claim that the bridge surface and railings were not defective and that the parish had no knowledge of any risk, the parish defendants submitted excerpts from Heine's deposition; excerpts from the deposition of his successor as parish manager, Floyd Leo Younger, Jr.; excerpts from Brandt's deposition; excerpts from Decoteau's deposition; excerpts from Boland's deposition; two affidavits from a professional engineer, T.J. Hirsch; a commitment letter and check concerning the bridge project from the Office of Rural Development; the minutes of the meeting of the parish police jury on April 13, 1999; and PEC Project Observation Reports Nos. 2, 9, and 10 concerning the overlay work on the road.[17] The parish defendants argue that this evidence demonstrates the bridge was not defective as designed and constructed. Further, even if some hazardous condition was present when Boland attempted to cycle across the bridge, the parish did not know of that hazardous condition, and it had not existed for such a length of time that the parish should have been aware of its existence. They also claim AASHTO standards do not apply to this road and bridge, and it was properly designed and constructed for its anticipated use.
Heine testified that he relied on Brandt's experience in building the "rail car" bridge in accordance with the plans *820 and specifications. He and Younger indicated the parish police jury decided to use crushed limestone, instead of concrete, on the bridge surface because it was cheaper. Before the overlay project on Island Road, the road surface leading to the bridge from Highway 61 on the east was asphalt, with gravel on the last 300-500 feet before the bridge; the road surface to the west of the bridge was gravel. After the overlay project, the road surface east of the bridge was asphalt and the road surface west of the bridge was "triple shot." Both Heine and Younger said no one ever indicated to the parish that the crushed limestone used on the bridge surface was inappropriate or should have been overlaid. They also stated there had been no other accidents involving cyclists on this or any other bridge in the parish, many of which had surface materials inconsistent with the adjoining road surfaces. Brandt testified he would have preferred to use concrete on the bridge, simply because his company would have made more money. But he also said crushed limestone was an acceptable surface for this bridge in this service, and he had so advised the parish. Brandt stated the bridge railings were built to a height of 30 inches.
In his deposition, Decoteau said he did not have a problem with the surface material on the bridge, because it did not affect the structural stability of the bridge, which was what he had been asked to review for the load limit calculation. He said he would have notified the parish if he would have had any concerns about the use of a crushed limestone aggregate surface. However, he also indicated he assumed the planned road overlay would include the bridge. Had he known that the overlay project for the adjoining road was not going to include the bridge surface, he would have notified the parish that he had concerns about that. He explained that, as a driver, he is always concerned whenever the road surface transitions from asphalt to gravel, "because of the difference in surfaces there, ... I think that it could be pretty dangerous." But his involvement with the Williams Creek bridge ended when he determined the load limits, and he did not know until this lawsuit that the surface of the bridge had remained crushed limestone after the road was overlaid. Therefore, he did not advise the parish of any such concerns. Decoteau said he did not know if AASHTO standards were applicable to this road and bridge, but he used its calculations as a guideline when computing the load limits. He did no measurements or other examination of the railings.
Boland said the first time she cycled over the bridge after it was built, the crushed limestone was "deep in some spots," and she may have walked her bicycle across that time, but on several later trips she was "able to ride on the car track through it without any trouble." On the day of the accident, she was approaching the bridge from the west, heading in a southeasterly direction toward Highway 61. She recalled that the road surface on that side of the bridge was asphalt  but with some rock in the mixture  and that she knew the road surface on the other side of the bridge was smoother asphalt. As she neared the bridge, she slowed and steered into the car track on the right side. Boland said she did not know what caused her bicycle to skid, but her effort to pedal out of the skid was ineffective and she ultimately veered to the left. When her bicycle hit the left edge of the bridge about halfway across, she momentarily sort of balanced with the guardrail against her hip, then fell over the left side of the bridge to the dry creek bed below. Although at the time she had no idea what caused the skid, she said she later concluded *821 the loose and unstable gravel had caused her rear tire to skid. Boland also said the surface condition of the bridge changed from day to day and from week to week, so she did not know how long the bridge had been in the precise condition that it was in when she had her accident. She could not recall whether any gravel was pushed up near the railing on the day of the accident, because the sequence of events happened so quickly.
Hirsch's affidavits stated he had been employed as an expert in road and bridge design and accident reconstruction in numerous courts here and in other countries and was one of the principal authors of "Section 13 Railings" of the LRFD Bridge Design Specifications and Commentary adopted by AASHTO in 1994. Portions of this document, along with photographs of the site, construction drawings, maps, and other documents were attached to and referred to in his first affidavit. Hirsch said he had reviewed the accident site, as well as maps, photographs, the adjoining roadways, other rural bridges in the area, other "rail car" bridges constructed by Branco, depositions, discovery responses, and the report of Boland's expert. Hirsch said this one-lane, rural road, with low traffic volume and posted speed limits of 25 miles per hour, was not required to meet the design criteria of AASHTO. Nor did AASHTO design criteria apply to any of the bridges on this road. According to his measurements, the metal bridge rail was 27 inches above the crushed limestone aggregate surface of the bridge. Appendix C of the AASHTO bridge design specifications, of which he was a principal author, stated the minimum height of a traffic railing was 27 inches; Hirsch said this requirement had remained constant since 1953 and was standard in all fifty states. Because this bridge was not specifically designed to carry bicycle or pedestrian traffic, a higher railing was not required. Hirsch further stated that the crushed limestone aggregate surface was not unstable, but was an all-weather, skid-resistant surface suitable for this type of bridge in this type of service. He concluded that the bridge's design and construction contained no defects and/or hazardous conditions.
Based on this evidence, we conclude the parish defendants demonstrated a lack of factual support that the Williams Creek bridge was defective due to a condition that created an unreasonable risk of harm and that the parish had actual or constructive knowledge of any risk associated with it. Moreover, this evidence supports the parish's claim that it had no actual or constructive knowledge of any temporary condition of the bridge that may have been hazardous at the particular time when Boland attempted to cycle across it. The parish defendants having demonstrated there was a lack of factual support for these essential elements of her cause of action, the burden of proof shifted to Boland to produce factual support sufficient to establish that she would be able to satisfy her evidentiary burden of proof at trial on these matters. See LSA-C.C.P. art. 966(C)(2).
In the portions of Heine's deposition submitted by Boland, he acknowledged that he would always prefer to have consistent surfaces, i.e., if the road surface was gravel, the bridge surface should also be gravel or aggregate, whereas if the road surface was asphalt or concrete, the bridge surface should also be concrete. But he also said the crushed limestone aggregate was a reasonable alternative, given the expense of concrete and "the traffic count, the usage, the type of vehicles that were using that particular bridge...." Younger stated the parish had received complaints from local residents about the number of cyclists using the rural roads, *822 but he was advised that the parish could not legally restrict the cyclists' use of public roads.
Boland's account of the way her accident happened was confirmed by the affidavit of John Sanford, who was riding about fifty yards behind her when she and another cyclist rode onto the bridge. He saw her rear wheel fishtail and, within less than five seconds, she went over the guard rail. Sanford stated, "I fault the surface material on the bridge and the low rail as the cause of the accident." Charles R. Rome, who was riding to Boland's right and slightly ahead of her, said in his affidavit that he heard the sound of a wheel sliding. Looking back at Boland, he saw her rear tire sliding in the gravel  first to the left, then right, then back to the left  bringing her near the left railing. Either she or the bike contacted the railing, and she fell over. Rome also opined that the surface material and railing were the sole causative factors of her fall.
Olin K. Dart, Jr., Ph.D., P.E., submitted an affidavit in support of Boland, indicating his qualifications included traffic engineering, highway design, traffic safety, and accident reconstruction, and stating he had been qualified as an expert in each of those fields on numerous occasions in state and federal courts. He had reviewed the site, photographs of the site, the bicycle, Boland's weight and body dimensions, several AASHTO guides, design drawings of this and other "rail car" bridges from Branco, plans for several other rural bridges, design specifications from Louisiana's Department of Transportation and Development (DOTD) for guardrails and bridges, and depositions. According to his measurements, the railings were 28.5 inches above the center of the bridge, but only 26.5 inches above the gravel "berm" near the edges of the bridge. The bicycle had 26-inch diameter wheels; it was 2.6 feet tall at the crossbar, 3 feet at the center of the handle bar, and 3.15 feet at the top of the seat. Boland is 5 feet, 9 inches tall and weighs 130 pounds. Dart noted that a 1977 AASHTO guide shows 27 inches as a minimum rail height and for bridges on lower volume secondary roads, a three-beam rail mounted 32 inches above the deck was specified. Based on his calculations of the centrifugal force and Boland's account of the way the accident happened, Dart concluded that as she skidded toward the rail, she tried a sharp corrective turn and the bicycle flipped over. Her centrifugal force at that point was above the top of the rail, causing her to topple over it. Dart said more likely than not, a 32-inch rail would have prevented her fall. Dart also noted that since 1961, AASHTO has required skid-resistant characteristics for all bridge floors, a specification that, in his opinion, would eliminate gravel or limestone aggregate as a bridge surface material, due to its inherent instability. He said the surface material naturally migrated to the edges under traffic, such that the bridge rail lost about 2 inches of its retention capability. He concluded the bridge should have been surfaced with a material other than gravel or crushed limestone aggregate and, at the very least, the railing should have been 32 inches high.
Having reviewed all of the evidence de novo, we conclude that Boland did not produce factual support sufficient to establish that she will be able to satisfy her evidentiary burden of proof at trial that the bridge was defective and the parish had actual or constructive knowledge of the risk. Her strongest evidence was Dart's affidavit, yet even he indicated a 27-inch railing was acceptable, although a 32-inch railing was preferable. His affidavit does not directly rebut Hirsch's statement that the minimum height for a metal railing was 27 inches, which was standard *823 in all fifty states and was met by the railings in this case. Based on Dart's own measurements, the railings were designed and constructed to exceed a height of 27 inches. Also, although Dart concluded that the surface material could migrate toward the edges, thus reducing the effective height of the railing, Boland could not say that her tires had, in fact, encountered such a buildup next to the railing or that such a condition existed when she fell. Therefore this conclusion concerning the cause of her fall is based on facts that are not in any of the evidence from Boland and the other cyclists who saw her fall. Dart also concluded it was Boland's attempt to make a "sharp corrective turn" that flipped the bicycle over toward the railing and created the centrifugal force sufficient to carry her over it, not the skid or some fulcrum effect created by the height of the railing itself and contact with it. Finally, although Dart opined a 32-inch railing might have prevented Boland's fall, this does not establish that it would have, and is internally inconsistent with his measurements showing the bicycle seat was almost 38 inches high and she was five feet, nine inches tall.
Regarding the bridge surface, Dart cited AASHTO standards stating it should be skid-resistant, but did not address Hirsch's contention  backed up by excerpts from the AASHTO manuals  that one-lane, rural roads and bridges with low traffic volume and low speeds were not required to meet AASHTO design criteria. Moreover, even if the AASHTO criteria were applicable, Dart's affidavit, taken in context with the other evidence, does not establish that the crushed limestone aggregate surface was unreasonably hazardous. Boland and the other cyclists had traveled this road and this bridge at least half-a-dozen times without any difficulty, and despite the large number of cyclists using the rural roads in the parish, there were no other accidents. The condition of the road and bridge surfaces was known to her, and the crushed limestone on the bridge surface was open and obvious as she approached it. She was the only cyclist using the bridge that day who had any problem navigating it.
Finally, none of the evidence submitted by Boland indicates the parish had any reason to believe the design or construction of the bridge was inherently defective due to the surface material used or the railing height. Nor did she produce any factual support to demonstrate that the parish knew or should have known of any temporarily hazardous condition that may have existed on the day she fell.
In granting the parish defendants' motion for summary judgment, the district court stated it "finds there was no obvious defect in the bridge and that the plaintiff failed to carry her burden to show actual or constructive notice of an alleged defect...." We agree that Boland failed to produce factual support sufficient to establish that she could satisfy her evidentiary burden of proof at trial that the bridge was defective in design and construction or that the parish had knowledge of any defective condition based either on the bridge's design and construction or on any temporary condition on the day she tried to cycle across it. Therefore, there was no genuine issue of material fact, and summary judgment was appropriate.

CONCLUSION
As discussed above, the motion to strike is granted in part and denied in part. The judgment of the trial court, granting summary judgment in favor of Decoteau, the parish, and Coregis, and dismissing Boland's claims against them, is affirmed. All costs of this appeal are assessed to Boland.
*824 MOTION TO STRIKE GRANTED IN PART AND DENIED IN PART; AFFIRMED.
CARTER, J., concurs in the result.
NOTES
[1] Suit was filed by Lynn S. Boland and her adult daughters; the appeal was also filed by all the plaintiffs.
[2] In the record, this defendant's surname is variously spelled Decoteau, Decateau, or Decateaux. We have used the spelling shown on his signature, which appears on several attachments to his deposition.
[3] This was a partial summary judgment, in that it dismissed Boland's claims against only some of the defendants. The court designated it as a final judgment, finding there was no just reason to delay, stating it did so in accordance with LSA-C.C.P. art. 1915(B)(1). We note, however, that because the judgment had the effect of dismissing the suit as to some of the parties, it was a final judgment, pursuant to Article 1915(A)(1), and did not have to be designated as such. See Motorola, Inc. v. Associated Indem. Corp., 02-0716 (La.App. 1st Cir.4/30/03), 867 So.2d 715. Given the confusion surrounding the application of Article 1915 at the time this judgment was signed, the court's prophylactic designation of the judgment as final is understandable.
[4] Boland's feet were attached to the pedals with toe clips, which are standard equipment for road bicycles.
[5] Branco constructed the Williams Creek bridge. Boland later added Branco's insurer, Transportation Insurance Company (Transportation), as a defendant.
[6] In describing pleadings filed by the parish and its insurer, Coregis, we will refer to them jointly as the parish defendants.
[7] They also filed cross-claims against Decoteau, Branco, Brandt, and Transportation.
[8] Under Article 966(B), any admissions on file can be considered by the court in deciding the motion for summary judgment. When exhibits are submitted by both parties, it is tantamount to an admission as to their authenticity.
[9] PEC performed the overlay project for Island Road after the Williams Creek bridge was built.
[10] On the exhibit list attached to their motion for summary judgment, the parish defendants describe these minutes as "April 15, 1999 West Feliciana Parish Police Jury Minutes." However, the minutes are dated April 13, 1999.
[11] The parish defendants also moved to strike a commitment letter and check from the Office of Rural Development related to the Williams Creek bridge repair grant, yet these documents were also submitted by the parish defendants and attached as Exhibit G to their motion for summary judgment. Therefore, although not sworn to or certified in any way, their authenticity is admitted.
[12] Portions of Heine's deposition were submitted by Boland and by the parish defendants.
[13] In their motion for summary judgment, the parish defendants did not address whether some condition of the bridge caused her to skid and fall. Although they did not concede causation, their arguments and evidence were not directed toward this element of Boland's cause of action.
[14] Boland and her witnesses often referred to the bridge surface material as "gravel," although it was actually crushed limestone aggregate.
[15] Alternatively, Boland would have to show that even if the bridge was properly designed and constructed, some defective condition was in existence on the day she attempted to cross it, and had been that way for such a period of time that the parish must have known about the condition and failed to repair it within a reasonable period of time.
[16] For this reason, there is also no possible vicarious liability on the part of the parish. See Racca, 872 So.2d 1117, 1122.
[17] PEC Project Observation Report Nos. 9 and 10 were unsworn, unverified, and not attached to any affidavit or deposition. Therefore, this court will not consider them.