906 So.2d 636 (2005)
Lashawn G. FREDERICKS
v.
DAIQUIRIS & CREAMS OF MANDEVILLE, L.L.C., et al.
No. 2004 CA 0567.
Court of Appeal of Louisiana, First Circuit.
March 24, 2005.
Writ Denied June 17, 2005.
*638 Rykert O. Toledano, Jr., Gordon T. Herrin, Hector R. Lopez, Toledano & Herrin, Covington, for Plaintiff-Appellant La-Shawn G. Fredericks.
Thomas G. Buck, Blue Williams, L.L.P., Metairie, for Defendant-Appellee Daiquiris & Creams of Mandeville, L.L.C.
Before: PARRO, KUHN, and WELCH, JJ.
PARRO, J.
In this personal injury suit, LaShawn G. Fredericks appeals a summary judgment in favor of Daiquiris and Creams of Mandeville, L.L.C., dismissing his claims against it. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
LaShawn G. Fredericks (Fredericks), his date, Laurie, another friend, and another couple went to Daiquiris and Creams of Mandeville, L.L.C. (DCM) about 8:30 p.m. on April 1, 2001. A live band was playing, and as the evening progressed, there were about fifty people socializing, drinking, and dancing. About 9:30 p.m., Christopher Gonzales, Patrick Caminita, and Phillip Caminita (the Gonzales defendants) arrived. Fredericks and his party did not know them, but the Gonzales defendants began interacting with them, paying particular attention to Laurie, including buying her drinks, sitting next to her at the bar, and watching her dance. They also stared at Fredericks in a way that made him uncomfortable. The two bartenders and a DCM employee working the door observed Fredericks, his date, and the Gonzales defendants, but did not perceive anything threatening going on. No one in the Fredericks party complained to the DCM employees or asked for any assistance. Sometime after midnight, although Laurie was still inside and was apparently reluctant to leave, Fredericks decided it was time to go and went to get the car. As he left the building, the Gonzales defendants followed him into the parking lot, where they beat him severely before running away. Fredericks was able to stumble back inside, where help was obtained. As a result of the quick, but brutal attack, several of Fredericks' facial bones were fractured, including his left cheekbone, jawbone, and orbital bones; he also suffered head trauma and possible neurological damage and had to undergo several reconstructive surgeries to his face and teeth.
Fredericks eventually sued DCM, its insurer, the Gonzales defendants, and their insurers, seeking damages for his injuries. DCM filed a motion for summary judgment on the issue of liability, claiming there was no history of fighting or altercations at DCM, its employees saw nothing threatening in the interactions between Fredericks and the Gonzales defendants, Fredericks did not report to DCM employees that he felt intimidated, and Fredericks admitted he had no warning and could not foresee that the Gonzales defendants intended to attack him. DCM contended it had no duty to prevent something that could not be foreseen or anticipated. After a hearing, the court agreed, dismissing *639 Fredericks' claims against DCM.[1] This appeal followed.

APPLICABLE LAW

Summary Judgment
An appellate court reviews a district court's decision to grant a motion for summary judgment de novo, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. The motion should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B); Johnson v. Evan Hall Sugar Co-op., Inc., 01-2956 (La.App. 1st Cir.12/30/02), 836 So.2d 484, 486.
On a motion for summary judgment, if the moving party will not bear the burden of proof at trial on the matter before the court on the motion, the moving party must point out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. If the adverse party then fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact and summary judgment must be granted. LSA-C.C.P. art. 966(C)(2); Washauer v. J.C. Penney, 03-0642 (La.App. 1st Cir.4/21/04), 879 So.2d 195, 197.

Negligence
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of Louisiana Civil Code article 2315. For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damage element). Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 275-76. The imposition of liability under general negligence principles requires proof that the defendant had actual or constructive knowledge of the risks and failed to take corrective action within a reasonable time. Hardenstein v. Cook Constr., Inc., 96-0829 (La.App. 1st Cir.2/14/97), 691 So.2d 177, 183, writ denied, 97-0686 (La.4/25/97), 692 So.2d 1093.
Duty is a question of law. Simply put, the inquiry is whether a plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his or her claim. Bowman v. City of Baton Rouge/Parish of East Baton Rouge, 02-1376 (La.App. 1st Cir.5/9/03), 849 So.2d 622, 627, writ denied, 03-1579 (La.10/3/03), 855 So.2d 315. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. Boland v. West Feliciana Parish Police Jury, 03-1297 *640 (La.App. 1st Cir.6/25/04), 878 So.2d 808, 815-16, writ denied, 04-2286 (La.11/24/04), 888 So.2d 231.

Duty of business owners to patrons
A business proprietor owes his patrons the duty to provide a reasonably safe place. Taylor v. Stewart, 95-1743 (La.App. 1st Cir.4/4/96), 672 So.2d 302, 306. The proprietor's general duty toward his patrons has been construed to encompass a number of more specific obligations. Taylor, 672 So.2d at 306-07. First, the proprietor must himself refrain from any conduct likely to cause injury to a guest. He must maintain his premises free from unreasonable risks of harm or warn patrons of known dangers thereon. Beyond these measures, the proprietor must exercise reasonable care to protect his guests from harm at the hands of an employee, another guest, or a third party. Taylor, 672 So.2d at 307; see Rodriguez v. New Orleans Public Serv., Inc., 400 So.2d 884, 887 (La.1981).
Reasonable care in the context of the threat of harm presented by the enumerated parties has been interpreted, in turn, to embrace certain sub-duties. First, should a disturbance or a likely disturbance manifest itself, the proprietor, if time allows, must attempt to prevent injury to his patrons by calling the police. Taylor, 672 So.2d at 307. Second, should the business owner or manager become aware of impending or possibly impending danger, he must warn his patrons of the potential danger. Taylor, 672 So.2d at 307.
As to criminal acts performed by third parties, there is generally no duty to protect others from the criminal acts of those parties. Taylor, 672 So.2d at 307. In other words, the general duty of reasonable care does not extend to protecting patrons from the unanticipated criminal acts of third parties. Taylor, 672 So.2d at 307; Rhodes v. Winn-Dixie Louisiana, Inc., 93-1848 (La.App. 1st Cir.6/24/94), 638 So.2d 1168, 1171. Only when the proprietor has knowledge of, or can be imputed with knowledge of, the third party's intended conduct is the duty to protect invoked, triggering the sub-duties discussed above. Taylor, 672 So.2d at 307. This duty only arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business. Determining when a crime is foreseeable is therefore a critical inquiry. Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762, 766.
The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances. Bezet v. Original Library Joe's, Inc., 01-1586 (La.App. 1st Cir.11/8/02), 838 So.2d 796, 801.

ANALYSIS
Because Fredericks had the burden at trial of proving that DCM had a duty to protect him from or prevent the harm that occurred, DCM, as the moving party, could satisfy its burden of proof on the motion for summary judgment by pointing out to the court that there was an absence of factual support that it owed such a duty to Fredericks under the facts of this case. See LSA-C.C.P. art. 966(C)(2). If it did so, Fredericks then had to produce factual support sufficient to establish that he would be able to satisfy his evidentiary burden of proof at trial. If he failed to make such a showing, there was no genuine *641 issue of material fact, and summary judgment was appropriate. See LSA-C.C.P. art. 966(C)(2). We examine the showings made by both parties to determine whether the district court's conclusion in this case was correct.
DCM supported its motion with the depositions of Fredericks; Brent Druery, the employee who was working at the door; Chad Montgomery, who was tending bar; and DCM's assistant manager, Patrick Bourgeois, who was also tending bar on the night Fredericks was attacked. In opposition to the motion, Fredericks submitted the same depositions; affidavits from his friends, Melanie Barletto and Buck Marenge; a copy of the police incident report; and a summary of his medical expenses. The affidavits, incident report, and medical expense summary focus on what occurred after the attack, so these have no relevance to the issue of whether DCM owed Fredericks a duty to prevent what happened to him. The four depositions are summarized to demonstrate their consistency concerning the events that preceded the incident.
Fredericks said the Mandeville location of Daiquiris & Creams was fairly new; he had only been there once or twice before, but had been to the Covington location over thirty times. He liked to frequent this establishment, because it was a "classy" place where he could be comfortable and enjoy himself. He had never had any problems at either location and had not heard of any altercations at either place. On the evening in question, he and his friends arrived at DCM about 8:30 p.m. He and Laurie sat at the bar and two of his friends sat toward the back. People were dancing, playing pool, drinking, and socializing; the crowd was well behaved and having a good time. About 9:30 p.m. the Gonzales defendants arrived; Fredericks noticed they were dressed differently from most of the other patrons, but he paid no attention to them when they first came in. At several times during the evening, when Fredericks left his seat at the bar to dance or go to the restroom, one of the Gonzales defendants would take his seat and "hit on" Laurie and buy her drinks until Fredericks returned. That person then would "stare down" at Fredericks from the end of the bar in an intimidating manner. Laurie eventually became quite inebriated, acting "freaky" and "dirty dancing" while the Gonzales defendants watched her. Fredericks was embarrassed and went outside for a minute; when he came back in, he told her it was time for them to leave. It was about 12:30 a.m. by this time. Laurie went back for another drink, and he told his other friends they were leaving and went to get the car. Fredericks said:
And I walked outside and as soon as I walked outside, he saysI heard, "You got a problem with me?" And as soon as I turned around I said, "Huh"? And that's when they started jumping on me.
He said he was only two or three steps out the door when one of them yelled at him; then all three men attacked him "without any warning." He was hit in the face, knocked down, and kicked. They then ran off, and he got up and walked back inside, where Druery assisted him and summoned help.
Fredericks said he thought Druery should have stopped the three men or gone after them as they hurriedly followed him out. He also said he had made "eye contact" with the bartender when one of the Gonzales defendants was hitting on Laurie, and the bartender "just kind of nodded like as in saying he's a punk ...." Although Fredericks said he felt uncomfortable with the situation, he did not alert any of the DCM employees. Fredericks said he had no reason to suspect the three men *642 would follow him outside and hit him; the attack was a complete surprise to him and was unforeseeable from his standpoint. He could not say that any of the DCM employees had actually seen him getting beaten.
Brent Druery said DCM had been open about seven months; he did not recall any "nuisance breaking out" before the night in question. On that night, he was working the door. There was a live band, and about forty to fifty people were in the lounge. Druery did not know anyone in the Fredericks party or the Gonzales defendants. Two other employees were working that nightChad Montgomery was tending bar and Patrick Bourgeois was supervisingthere may also have been a cocktail waitress. DCM did not employ any security personnel, but there was a security camera focused on the cash register and three "panic buttons" behind the bar. With reference to the attack on Fredericks, Druery said it was pretty late and the crowd had thinned somewhat. He was sitting at the door and recalled seeing Fredericks go in and out the door several times in about five or six minutes. "And eventually he came back in and he kind of stumbled into me and said, `They jumped me, they jumped me.'" Fredericks had a cut under his eye and was bleeding. Druery helped him sit down and told one of the bartenders to call the police. He then went outside and saw three guys running across the street. Druery said he did not see the Gonzales defendants follow Fredericks out and does not recall when they left the building. He had observed they were Hispanic, but otherwise had not taken notice of them during the evening and did not recall them acting drunk or rowdy. Druery had a limited view of the parking lot just outside the door; he said he did not hear or see the attack and did not know if anyone else saw it.
Druery said the bartenders had discussed how they would intervene if an argument appeared to be escalating, and said they would separate the parties by taking one outside and keeping the other in. He had never had to confront anyone, but knew of one occasion after this incident when Bourgeois had to break up a fight. The DCM employees also knew to keep an eye on people who might be drinking too much, and Druery said he was aware that if someone were hustling someone else's date, the situation could be volatile. If a conversation between customers went from casual to harassing, the bartenders would intervene and, if necessary, ask someone to leave. He had heard of one prior occasion where the bartenders had asked someone to leave. However, he did not remember seeing anything developing between Fredericks, his date, and the Gonzales defendants, and had no reason to suspect there might be trouble between them. In fact, he had not seen Fredericks talking to his date or to the Gonzales defendants, and had no idea they had been bothering him or his girlfriend in any way. No one had complained to him or asked for assistance with a threatening situation.
Montgomery began working as a bartender when DCM opened in September 2000. To his knowledge, there had never been any problems there or at the Daiquiris & Cream in Covington before the attack on Fredericks. He did not recall seeing Fredericks at DCM before that evening. He knew the Caminitas brothers by sight, but he did not know Gonzales. He knew nothing about any of their reputations. On the night in question, he, Bourgeois, and a female employee were tending bar, and Druery was working the door. There was a live band and about fifty people were in DCM at any given time. Montgomery stayed behind the bar the entire evening, and recalled Fredericks and a *643 blond girl sitting near the door at a corner of the bar. However, he did not recall anything else about either of them and did not recall serving them drinks. He also remembered the Gonzales defendants being there, but did not recall how they were dressed, where they were seated, or whether they had any interactions with Fredericks or his date.
Montgomery said if he saw one patron "staring down" another, he would monitor the situation and intervene if it became necessary. But he did not witness any of that behavior from the Gonzales defendants towards Fredericks. Fredericks did not make eye contact with him to call anything to his attention, and he did not see his date talking to any of the Gonzales defendants. He first learned about the attack when he was in the back getting ice to fill up the sinks, and someone told him there had been a fight in the bathroom. He saw Fredericks lying on the bathroom floor, and later learned the attack had actually occurred in the parking lot. He saw nothing that night that gave him any reason to suspect there was likely to be any trouble or that there was any threat to Fredericks.
Bourgeois was hired as an assistant manager for DCM about a month before this incident took place. Before this occurrence, he had never had to use the panic button or call 911 for assistance. On the night Fredericks was attacked, there may have been as many as fifty people in the bar at the high point of the evening, but fewer as closing time neared. Bourgeois and Montgomery were tending bar and Druery was at the door. He recalled that he might have seen Fredericks in DCM before, but did not recall ever seeing the Gonzales defendants before that night. Bourgeois remembered Fredericks and his date seated at the corner of the bar and later seated at a different location at the bar. He did not recall seeing the Gonzales defendants as a group, but "might have seen one or two of them hanging around together ...." He recalled them being in the same general vicinity as Fredericks and his datewithin about a six-foot square in that area of the loungebut did not remember any of the Gonzales defendants going over to Fredericks' date. He did not recall any of them dancing.
Bourgeois saw nothing suspicious or unusual about the Gonzales defendants. "They were just guys out, you know, out at the bar." Although there were certain signs of trouble he generally looked for while working, such as arguing, belligerence, slamming down a glass, etc., Bourgeois said he did not observe any signs of trouble from the Gonzales defendants. Fredericks did not make eye contact with him or tell him anything was going on. Bourgeois stated emphatically:
I would know if a customer had a problem. It's my job to know those things. It's my job to pick up on them if I see a problem that's arising. We get so few incidences of anything going on, I remember them. It just doesn't happen. We're a neighborhood bar and very safe. We're very well controlled.
Bourgeois remembered Laurie as having blond or reddish-blond hair; he assumed she was with Fredericks. He recalled serving her one shot of cinnamon or peppermint Schnapps, but did not see her dancing or notice anything out of the ordinary in her behavior. He was still behind the bar when a customer told him someone had been injured, and he went to the bathroom where Montgomery was helping Fredericks while they waited for the medical team and police. He saw nothing of the attack itself. Bourgeois said the parking lot was well lit, and there had been no previous incidents of violence there or inside the lounge that would have prompted *644 DCM to take any more strenuous security measures. He did acknowledge that since that time, about three incidents had occurred in which the police were called, but none of those situations involved patrons being injured or attacked.
In his appeal to this court, Fredericks contends the trial court applied an incorrect standard of law by requiring "actual knowledge of an impending attack on one guest by another," rather than just recognizing DCM had a duty to exercise reasonable care to protect its guests from injury inflicted by other guests. He also argues that the trial court improperly applied the principle of foreseeability. In introducing these arguments, Fredericks contends the correct applicable legal principle is that a lounge owner has a duty to protect his guests from injury at the hands of other guests "irrespective of whether the lounge had notice of the impending attack." He also contends that DCM's employees' general denials of Fredericks' allegations create genuine issues of material fact.
Addressing the second contention first, having compared Fredericks' deposition to those of the three DCM employees, we find no genuine issues of material fact concerning any of the factors relating to DCM's duty to its customers. Fredericks said the actions of the Gonzales defendants were making him uncomfortable, and the DCM employees should have done something to prevent the attack on him. The DCM employees said they either did not see the interactions Fredericks described, or did not perceive any of those actions as hostile or threatening to Fredericks. What may have seemed harassing and intimidating to Fredericksother men making casual conversation with his date, buying her drinks, watching her dance, and "staring down" at himwere not so obviously threatening to another observer. In fact, similar activities and interactions occur in virtually every bar on any weekend night. Even if every DCM employee in the place had seen and taken notice of these interactions, there was no reason to intervene as a result of these activities.
Fredericks' argument concerning foreseeability states that every bar owner owes a duty to exercise reasonable care to protect guests from injury inflicted by other guests, and no further inquiry into foreseeability or duty-risk is required unless the injury is inflicted by the criminal acts of an independent third party who is not also a guest. He contends the lounge owner's standard of care is higher when a guest attacks another guest than it is if a third party attacks a guest. This is a misunderstanding of the legal principles; it would shift the basis of the bar owner's liability from negligence to strict liability when one guest injures another, and this simply is not the applicable standard.
The applicable duty owed by a bar owner to a guest does not differ when the guest is criminally attacked by another guest, rather than by a third party. In the Taylor case, a woman was assaulted by her former boyfriend after following him into the parking lot of a bar; both had been patrons of the bar shortly before the attack occurred. This court held the bar proprietor had no duty to protect her from such an attack, despite a history of past troubles between the two, because neither the proprietor nor her employees had any prior knowledge that he might physically harm her. Taylor, 672 So.2d at 309. This court drew no distinction between injury inflicted on a guest by another guest and injury inflicted on a guest by a stranger, stating:
As set forth earlier, while a proprietor must exercise reasonable care to protect his guests from harm at the hands of an employee, another guest, or a third party, *645 reasonable care embraces an attempt to prevent injury to his patrons by calling the police, if time allows, or warning the patron. However, as to criminal acts performed by third parties, the general duty of reasonable care does not extend to protecting patrons from the unanticipated criminal acts of third parties. Only when the proprietor has knowledge of, or can be imputed with knowledge of, the third party's intended conduct is the duty to protect invoked.
Id.
This court also noted, however, that if a business owner or manager became aware of impending or possibly impending danger, he must warn his patrons of the potential danger. Taylor, 672 So.2d at 307. In this case, DCM submitted evidence that its employees were not aware of impending or possibly impending danger to Fredericks. The burden then shifted to Fredericks to provide factual support sufficient to establish that he would be able to satisfy his evidentiary burden of proof at trial that the DCM employees either had such knowledge or should have had such knowledge, based on the nature of the interactions between him and the Gonzales defendants. The evidence submitted by Fredericks does not show that the DCM employees had any awareness of what was about to happen; nor does that evidence demonstrate such overtly hostile actions that the DCM employees should have known that trouble was brewing or had reason to anticipate problems from the Gonzales defendants.
We note also that, contrary to his arguments, the cases cited by Fredericks actually include the element of foreseeability in analyzing the bar owner's duty to prevent injury to its customers at the hands of another guest. In Atkins v. Frazell, 470 So.2d 505, 512 (La.App. 1st Cir.1985), liability was imposed on a bar owner when a barmaid heard actual threats being made and warned the owner of an impending fight between two guests, but the owner did nothing to prevent the altercation. In Miller v. Derusa, 77 So.2d 748 (La.App. 1st Cir.1955), the evidence showed the bar owner knew of hostility between his two customers and knew the defendant intended to "get" the plaintiff on the night in question, but failed to intervene. In contrast, here there was no history of problems at DCM; there was no history of problems between Fredericks and the Gonzales defendants, who did not even know each other; the DCM employees did not know the Gonzales defendants or know anything negative about them; there were no actions from which the DCM employees or any other observer could conclude that trouble was imminent; and there was no time or opportunity to warn Fredericks or prevent the attack on him once it began.
The evidence presented in support of the motion for summary judgment pointed out an absence of factual support for Fredericks' claim that DCM owed a duty to prevent this attack on him under these circumstances, in which such an attack was, by his own admission, completely unforeseeable. He did not present evidence to show he would be able to carry his burden of proof at trial on this element of his claim. Accordingly, summary judgment in favor of DCM was appropriate.

CONCLUSION
For the foregoing reasons, we affirm the judgment granting the motion for summary judgment in favor of Daiquiris and Creams of Mandeville, L.L.C. and dismissing the claims of LaShawn G. Fredericks against it. All costs of this appeal are assessed to Fredericks.
AFFIRMED.
NOTES
[1] A brief in the record indicates the Gonzales defendants were never served, and the court stated in the judgment that DCM was "the only defendant to have made an appearance in this litigation ...."