# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2024 CA 0264

### BRANDON BROWN

### VERSUS

### ENGLAND, L.P., TAMMY HOTARD, WINDSOR PLACE, ABC INSURANCE COMPANY AND EFG INSURANCE COMPANY

Judgment Rendered: **SEP** 2 6 2024

* * * * * *

On Appeal from the Eighteenth Judicial District Court
In and for the Parish of Iberville
State of Louisiana
Docket No. 81470

Honorable Alvin Batiste, Jr., Judge Presiding

* * * * * *

| | |
|---|---|
| Larry M. Aisola, Jr.<br>Chalmette, Louisiana | Counsel for Plaintiff/Appellant<br>Brandon Brown |
| Brad J. Brumfield<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellee<br>Tammy Hotard |

* * * * * *

BEFORE:  McCLENDON, WELCH, AND LANIER, JJ.

**McCLENDON, J.**

Plaintiff appeals the trial court's judgment denying plaintiff's motion to continue, granting summary judgment in favor of defendant, and dismissing plaintiff's claims against defendant. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

The following facts are undisputed. On June 26, 2021, Brandon Brown, plaintiff-appellant herein, was a guest in his mother's apartment at the Windsor Place apartment complex located in St. Gabriel, Louisiana. Mr. Brown's stepson, Jyvariel Harvey, knocked on the door. Mr. Brown greeted and hugged Mr. Harvey. When Mr. Brown turned, anticipating that Mr. Harvey would follow him inside, Mr. Harvey unexpectedly shot Mr. Brown.

On April 1, 2022, Mr. Brown filed a petition seeking damages for the injuries he sustained in the shooting. The petition named as defendants Windsor Place; England Partner, L.P., in its capacity as the owner of Windsor Place; and Tammy Hotard, defendant-appellee herein, in her capacity as the "On Site Property Manager" of Windsor Place. Mr. Brown's petition generally alleged fault on the part of the three defendants, such as failing to provide a safe environment, failing to provide warnings about unsafe conditions, and failing to have sufficient security measures. However, Mr. Brown's petition did not allege specific acts of negligence on the part of the three defendants.

Ms. Hotard answered the petition, generally denying Mr. Brown's allegations, and propounded interrogatories, requests for production of documents, and requests for admissions to Mr. Brown.[1] Relevant to the issues on appeal, in response to an interrogatory requesting that Mr. Brown "list, with specificity, all the facts that [he would] rely upon to establish [his] claims" that Ms. Hotard was at fault "in causing [him] to be shot[,]" Mr. Brown's verified responses, dated September 16, 2022, provided: "Tammy Hotard was the general manager of the apartment and was responsible for the gate working properly. As such, Tammy Hotard is responsible for allowing Jyvariel Harvey to walk into (sic) without having to check in." After Mr. Brown responded to Ms. Hotard's

---

[1] It appears that Ms. Hotard is the only defendant who answered the petition and is the only party defendant to the summary judgment before us on appeal.

discovery requests, additional discovery included the January 17, 2023 deposition of plaintiff-appellant, Brandon Brown; the January 17, 2023 deposition of Sandra Brown, Mr. Brown's mother; and the February 2, 2023 deposition of David "OJ" Johnson, a police officer and resident of Windsor Place who served as the Windsor Place Courtesy Officer.

On July 19, 2023, Ms. Hotard filed a motion seeking summary judgment and the dismissal of Mr. Brown's claims against her, arguing that Mr. Brown would be unable to prove she was at fault because she neither owed nor breached a duty to Mr. Brown under the specific circumstances of his shooting. Ms. Hotard argued that, as the apartment manager, she did not owe a special duty to control or warn Mr. Brown against the criminal actions of a third person. Ms. Hotard further argued that, to the extent Mr. Brown may argue Windsor Place was a business establishment that owed a duty to guard its patrons against criminal acts, Windsor Place as a business establishment would not have owed a duty to guard Mr. Brown against an unforeseeable shooting. In support of her summary judgment motion, Ms. Hotard offered Mr. Brown's discovery responses and the deposition testimony given by Mr. Brown, Ms. Brown, and Officer Johnson.

In opposition to Ms. Hotard's summary judgment motion, Mr. Brown filed a motion to continue the summary judgment hearing. Mr. Brown argued that although he sent a subpoena to the St. Gabriel Police Department on April 5, 2023, and the subpoena was served on April 24, 2023, he had not received a response. Mr. Brown maintained that his ability to oppose Ms. Hotard's summary judgment motion was "hampered" without the sought-after discovery. Thus, he requested that the trial court continue the hearing without date, or until Mr. Brown could obtain written discovery responses and deposition testimony from the St. Gabriel Police Department.

In response to Mr. Brown's motion to continue, Ms. Hotard filed a reply memorandum in support of her summary judgment motion. Ms. Hotard argued that although Mr. Brown contended he sent a subpoena to the St. Gabriel Police Department, Mr. Brown had not shown that he had taken action with the court to enforce the subpoena. Further, Ms. Hotard maintained that even if Mr. Brown obtained the requested records, and the records established a pattern of crime at Windsor Place, Ms. Hotard was

3

not liable to Mr. Brown in this matter, where Mr. Brown himself did not anticipate this crime.

The trial court heard Ms. Hotard's motion for summary judgment and Mr. Brown's motion to continue on September 28, 2023. The trial court denied Mr. Brown's motion to continue, stating, "I don't think any amount of additional discovery from the Saint Gabriel Police Department would in any way help you to survive the motion for summary judgment in this case." The trial court then granted Ms. Hotard's summary judgment motion, finding "that defendant, Tammy Hotard, owed no duty to plaintiff, Brandon Brown." The trial court signed a written judgment in conformity with its rulings on October 12, 2023, and dismissed all of Mr. Brown's claims against Ms. Hotard, with prejudice. Mr. Brown appealed.

## LAW AND DISCUSSION

A ruling on a motion for summary judgment is reviewed under a *de novo* standard, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. **Corbajal v. Chris Owens French Quarter Parade, LLC**, 2024-00191 (La. 5/21/24), 385 So.3d 236, 237-38. Pursuant to LSA-C.C.P. art. 966(D)(1), the burden on the party moving for summary judgment "does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." **Corbajal**, 385 So.3d at 238. When a motion for summary judgment is made and supported, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. LSA-C.C.P. art. 967(B); **Corbajal**, 385 So.3d at 238. Once a motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. **Id**.

Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can only be seen in light of the substantive law

4

applicable to the case. **Pumphrey v. Harris**, 2012-0405 (La.App. 1 Cir. 11/2/12), 111 So.3d 86, 89. The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. **Evans v. Abubaker, Inc.**, 2023-00955 (La. 5/10/24), 384 So.3d 853, 858. Whether a duty is owed by one party to another is a question of law which depends upon the facts and circumstances of the case and the relationship of the parties.[2] **Terrell v. Wallace**, 98-2595 (La.App. 1 Cir. 12/28/99), 747 So.2d 748, 750, <u>writ denied</u>, 2000-0297 (La. 3/24/00), 758 So.2d 158. The plaintiff bears the burden of establishing the duty the defendant owed under the circumstances. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment. **Fredericks v. Daiquiris & Creams of Mandeville, L.L.C.**, 2004-0567 (La.App. 1 Cir. 3/24/05), 906 So.2d 636, 639-640, <u>writ denied</u>, 2005-1047 (La. 6/17/05), 904 So.2d 706.

Generally, there is no duty to protect others from the criminal activities of third persons. **Posecai v. Wal-Mart Stores, Inc.**, 99-1222 (La. 11/30/99), 752 So.2d 762, 766. However, jurisprudence has recognized exceptions to this general rule where a special relationship gives rise to such a duty.[3] **Haynes Interests, LLC v. Garney Companies, Inc.**, 2019-0723 (La.App. 1 Cir. 2/26/21), 322 So.3d 292, 303, <u>writ denied</u>, 2021-00451 (La. 5/25/21), 316 So.3d 447. Pertinent to this appeal, the Louisiana Supreme Court in **Posecai**, 752 So.2d at 766, held that while business owners generally have no duty to protect others from the criminal acts of a third person, "they do have a

---

[2] Louisiana courts have adopted a duty-risk analysis in determining whether liability exists under the facts of a particular case. Under this analysis, the plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element); and, (5) proof of actual damages (the damages element). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. **Evans v. Abubaker, Inc.**, 2023-00955 (La. 5/10/24), 384 So.3d 853, 858 n.4.

[3] For instance, a special relationship gives rise to such a duty in the case of the relationship between parent and child; employer and employee; carrier and passenger; innkeeper and guest; shopkeeper and business visitor; restaurateur and patron; jailer and prisoner; and teacher and pupil. <u>See</u> **Paul v. LDG Port Royal Development, L.L.C.**, 2021-0269 (La.App. 1 Cir. 10/18/21), 2021 WL 4843937 at *2, <u>writ not considered</u>, 2021-01722 (La. 1/12/22), 330 So.3d 616, citing **Terrell**, 747 So.2d at 750. In contrast, this court has found that landowners do not have a special relationship with those who live on their premises, and accordingly they have no corresponding special duty. **Smith v. Howard**, 489 So.2d 1037-1038 (La.App. 1 Cir. 1986). The relationship between Mr. Brown, plaintiff herein, and Ms. Hotard, the manager of Mr. Brown's mother's apartment complex, is not one of the special relationships courts have found give rise to a duty to protect others from the criminal activities of third persons. <u>See</u> **Paul**, 2021 WL 4843937 at *2, citing **Terrell v. Wallace**, 98-2595 (La.App. 1 Cir. 12/28/99), 747 So.2d 748, 750, <u>writ denied</u>, 2000-0297 (La. 3/24/00), 758 So.2d 158. Thus, we need not consider these exceptions further.

duty to implement reasonable measures to protect their patrons from criminal acts when those acts are foreseeable[.]"Critically, however, the duty to protect patrons from criminal acts only arises under limited circumstances, when the criminal act in question is reasonably foreseeable to the owner of the business. **Posecai**, 752 So.2d at 766. In short, it is only when the proprietor has knowledge of, or can be imputed with knowledge of, the third party's intended conduct that the duty to protect is invoked.[4] **Fredericks**, 906 So.2d at 640.

In **Posecai**, 752 So.2d at 768, the Louisiana Supreme Court adopted the following balancing test to determine whether a business owed a duty to protect its customers from the acts of a third party:

> With the foregoing considerations in mind, we adopt the following balancing test to be used in deciding whether a business owes a duty of care to protect its customers from the criminal acts of third parties. The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances.

> The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.

The Supreme Court applied the **Posecai** balancing test in **Ponceti v. First Lake Properties, Inc.**, 2011-2711 (La. 7/2/12), 93 So.3d 1251, 1251-52, when considering whether the owner of an apartment complex owed a duty to protect its residents from injury caused by individuals riding bicycles on the complex sidewalks. As there was no

---

[4] While business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks, to extend this limited duty to require business owners to protect the general public at large at all times, including the hours during which the business is closed to the public, would require businesses to assume responsibility "for the endemic crime that plagues our communities, a societal problem that even our law enforcement and other government agencies have been unable to solve." **Posecai**, 752 So.2d at 768.

evidence of similar incidents, **Ponceti** concluded that the apartment complex did not owe a legal duty to the plaintiff under the facts of the case. **Ponceti**, 93 So. 3d at 1253.

In addition to a business's duty to implement reasonable measures to protect patrons from criminal acts when those acts are foreseeable, a business may also voluntarily assume a duty to protect others against the risk of criminal activity, and when it does so, it must perform that protection with reasonable care. **Haynes**, 322 So.3d at 303, citing **Harris v. Pizza Hut of Louisiana, Inc.**, 455 So.2d 1364 (La. 1984) ("**Pizza Hut**"). This rule, which was set forth in **Pizza Hut**, 455 So.2d 1364, pre-dated **Posecai**. In **Pizza Hut**, without deciding whether the restaurant had a duty to hire a security guard, the Louisiana Supreme Court found that the restaurant had assumed the duty to protect its patrons against criminal misconduct by third parties, and therefore, was liable for the guard's negligent breach of that duty. See **Pizza Hut**, 455 So.2d at 1369-71. In **Posecai**, the Louisiana Supreme Court rejected the court of appeal's finding that a store assumed a duty to protect its patrons from crime when it hired a security officer to guard its cash office, because the court of appeal had relied on "an erroneous interpretation" of **Pizza Hut**. **Posecai** explained:

> **Pizza Hut** does not stand for the proposition that a business assumes the duty to protect its customers from the criminal acts of third persons merely because it undertakes some security measures. Rather, **Pizza Hut** was an ordinary negligence case, holding that a security guard employed by a business must exercise reasonable care for the safety of the business' patrons and breaches that duty when his actions cause an escalation in the risk of harm. In Pizza Hut, the restaurant's security guard was negligent because he heightened the risk of harm to Pizza Hut's customers by provoking gunfire from armed robbers who had entered the restaurant.

**Posecai**, 752 So.2d at 769 n.7. Subsequent jurisprudence has also distinguished between cases such as **Pizza Hut** and **Posecai**, in which "some" security measures were taken that were insufficient to establish that the business assumed the duty, and cases where a business "adopted a comprehensive security plan," which was sufficient to establish the existence of a duty. See **Pinsonneault v. Merchants & Farmers Bank & Trust Co.**, 2001-2217 (La. 4/3/02), 816 So.2d 270, 278 n.4.

In this case, Ms. Hotard sought summary judgment on the basis that there was an absence of factual support for the duty element and the breach of the duty element of Mr. Brown's negligence action. Thus, as the mover on the motion for summary judgment,

7

Ms. Hotard bore the burden of proof. See LSA-C.C.P. art. 966(D)(1). However, as the plaintiff, Mr. Brown would bear the burden at trial of establishing the duty Ms. Hotard owed under the circumstances. **Fredericks**, 906 So.2d at 40. Consequently, Ms. Hotard was not required to negate all essential elements of Mr. Brown's claim in order to prevail on summary judgment, but could instead satisfy her initial burden of proof on the motion for summary judgment by pointing out an absence of factual support that she owed a duty to Mr. Brown because the shooting was not reasonably foreseeable. See LSA-C.C.P. art. 966(D)(1). See **Strauss v. Ironshore Specialty Insurance Company**, 2020-0411 (La.App. 1 Cir. 12/30/20) 2020 WL 7770879, *3 (unpublished). If Ms. Hotard did so, Mr. Brown then had to produce factual support sufficient to establish that he would be able to satisfy his evidentiary burden of proof at trial. If he failed to make such a showing, there was no genuine issue of material fact, and summary judgment was appropriate. See LSA-C.C.P. art. 966(C)(2); **Fredericks**, 906 So.2d at 640-41. We now examine the showings made by both parties to determine whether the trial court's conclusion in this case was correct. See **Fredericks**, 906 So.2d at 641.

As noted above, the following facts are undisputed. Brandon Brown, plaintiff-appellee herein, was inside his mother's apartment, Windsor Place apartment number 1406, with her permission on June 26, 2021. Mr. Brown's stepson, Jyvariel Harvey, knocked on the door of the apartment. Mr. Brown and Mr. Harvey greeted each other, and Mr. Brown "gave him a hug." When Mr. Brown turned around to go back inside, he expected Mr. Harvey to follow him; instead, Mr. Harvey shot Mr. Brown and fled the scene.

During Mr. Brown's deposition, he testified that he had been married to Mr. Harvey's mother, Falicia Harvey Brown. In Mr. Brown's verified discovery responses, Mr. Brown described his relationship with Mr. Harvey as follows: "Plaintiff was Jyvariel Harvey['s] stepfather, good relationship, met him when he was 9. He wanted special treatment for his mom's funeral." Mr. Brown testified that when Falicia, his wife and Mr. Harvey's mother, passed away in January 2021, Mr. Harvey was incarcerated and unable to attend her funeral. When describing his interactions with Mr. Harvey before the shooting, Mr. Brown testified that he had spoken to Mr. Harvey on the phone about

8

Falicia's deteriorating health and when Mr. Harvey expected to be released, but "there wasn't no argument." Mr. Brown stated, "It was just a regular conversation." Mr. Brown believed that Mr. Harvey was released a day or two before the shooting. Mr. Brown testified that Mr. Harvey had never threatened him before the night of the shooting, and Mr. Brown did not know why Mr. Harvey shot him until after the fact. Mr. Brown stated, "Well, as far as the whole upset with her dying [sic]. He wanted certain things that just didn't happen." Mr. Brown spoke to Mr. Harvey when he was in jail after the shooting, and Mr. Harvey apologized.

Ms. Brown testified that her son, plaintiff-appellee herein, visited her often at her Windsor Place apartment because she lived by herself. Ms. Brown knew Mr. Harvey both as Mr. Brown's stepson and because he had been a student at the school where she worked in the library. During Ms. Brown's deposition, the following exchange occurred between counsel for Ms. Hotard and Ms. Brown:

> Q[.] On the date of the incident, would there have been any reason that you wouldn't have let Mr. Harvey come to that apartment complex?
>
> A[.] No.
>
> Q[.] … On the date of the incident, were you aware of any type of disagreement between your son and Mr. Harvey?
>
> A[.] No.

Officer Johnson, a police officer with fourteen years of experience, testified he'd been a resident of Windsor Place for about six years, "[a]lmost as long as they've been open," and served as the Courtesy Officer in exchange for free rent. At the time of the shooting, Mr. Johnson was employed with the Brusly Police Department as a School Resource Officer and a patrol officer; at the time his deposition was taken, Mr. Johnson was employed with the White Castle Police Department as a patrol officer. As Courtesy Officer at Windsor Place, Mr. Johnson testified he would walk around the complex at random times of the day while wearing either a police shirt or a police uniform. Mr. Johnson also brought his patrol car home to Windsor Place with him. Mr. Johnson agreed that the presence of a police car, and an officer walking around an apartment complex, was a "deterrent to crime." However, Mr. Johnson did not handle serious complaints, and he or the tenants would call 911 when there was "a[n] actual crime going on[.]" Thus,

Mr. Johnson testified that his role as Courtesy Officer involved handling such issues as noise complaints, "[l]ockouts[,]" when a tenant "has locked themselves out[,]" or "kids playing on the stairwell or loitering."

Regarding the general safety of the Windsor Court premises, Mr. Johnson testified the complex was located less than a mile from the St. Gabriel Police Department. Mr. Johnson generally knew the residents of Windsor Place quite well. He alternately described Windsor Place as "extremely" and "fairly" quiet. Mr. Johnson recalled the gates to the apartment complex were generally open during the day and closed at night prior to the Covid-19 pandemic, while Ms. Brown testified that the gates were often open at night prior to the Covid-19 pandemic. Regardless, it is undisputed that the gates were intentionally left open on the night of the shooting due to the Covid-19 pandemic.

Mr. Johnson was not aware of gun violence on the property before the shooting on June 26, 2021, and testified it was "absolutely not" something he expected to occur. Ms. Brown testified she'd seen fights in the parking lot "maybe once or twice" at Windsor Place, "all hours of the night[,]" but the involved parties would generally be inside before police arrived. Ms. Brown had not heard of other incidents of gun violence and did not make complaints to the complex about violence. Mr. Brown testified he had heard of violence at Windsor Place prior to the shooting, and had heard of someone being threatened with a gun in 2019 or 2020, but he had not heard of anyone being shot.

Specifically regarding the shooting at issue, Mr. Johnson testified he remembered Ms. Brown, but he did not know Mr. Brown, his stepson Mr. Harvey, or the relationship between Mr. Brown and Mr. Harvey. Mr. Johnson testified that observing a vehicle he did not recognize, being told someone was going to see their stepfather, or seeing a tenant allow someone to enter their unit would not have caused him any suspicion, stating, "[t]enants can - - they have guests." Mr. Johnson testified that he was sleeping when the shooting at issue occurred at about eleven o'clock at night. He received a phone call from maintenance, looked out his window, and saw "all the police and EMS and everybody out there." He did not work for the police department that was investigating the accident, but was told by an officer that there had been a shooting. He called Ms. Hotard, conveyed what he knew, and went home to begin his report.

10

Having conducted a thorough *de novo* review of the documents Ms. Hotard offered in support of her summary judgment motion, we find that Ms. Hotard successfully pointed out the absence of factual support for the duty element of Mr. Brown's claim against her. As set forth above, there is generally no duty to protect others from the criminal activities of third persons. **Posecai**, 752 So.2d at 766. Rather, the duty of a business owner to protect its patrons from the criminal acts of third persons only arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business. See **Posecai**, 752 So.2d at 766.

In this case, the evidence did not demonstrate that Ms. Hotard knew or should have known that Mr. Harvey would shoot Mr. Brown. To the contrary, Mr. Brown, Ms. Brown, and Officer Johnson all testified that they had no knowledge of previous shootings at Windsor Place, and Mr. Brown and Ms. Brown testified that they had no advance knowledge that Mr. Harvey presented a threat to Mr. Brown. Because the evidence submitted by Mr. Brown does not establish that Mr. Harvey's violence against Mr. Brown was foreseeable, it was insufficient to establish that Ms. Hotard owed a duty to prevent what occurred. Even Mr. Brown did not foresee being shot by Mr. Harvey. See **Martinez v. Wilson**, 2009-0442 (La.App. 1 Cir. 10/23/09), 2009 WL 3454251, *5 (unpublished). In short, the duty to protect that is owed by a business proprietor with knowledge or imputed knowledge of the intended crime did not arise in this matter. See **Fredericks**, 906 So.2d at 640. We further note that the limited security measures undertaken by Windsor Place by engaging a single Courtesy Officer, who worked full-time off-site and whose presence primarily served as a deterrent to crime, plainly did not constitute an assumption of the duty on behalf of Ms. Hotard to protect Mr. Brown from the unforeseeable threat posed by his stepson. See **Pinsonneault**, 816 So.2d at 278 n.4.

We note Mr. Brown's argument that he should have had the opportunity to deny Mr. Harvey access to Windsor Place. However, the deposition testimony of Mr. Brown and Ms. Brown established that they were both unaware that Mr. Harvey wanted to shoot Mr. Brown before the shooting occurred, and Mr. Brown's deposition testimony further established that he voluntarily welcomed Mr. Harvey into the apartment. Thus, as a

11

practical matter, we do not find that Mr. Brown's opportunity to deny Mr. Harvey access would have changed the outcome in this matter.

Because Ms. Hotard established the absence of factual support for the duty element of Mr. Brown's claim, the burden shifted to Mr. Brown to put forth proof that a genuine issue of material fact existed such that Ms. Hotard was not entitled to judgment as a matter of law. Mr. Brown did not present evidence in opposition to Ms. Hotard's motion, but instead, sought a continuance in order to obtain discovery responses from the St. Gabriel Police Department. However, Mr. Brown did not explain what evidence the St. Gabriel Police Department could possibly have in its possession that would establish Ms. Hotard owed Mr. Brown a duty to protect him from being shot by his stepson under these circumstances, where Mr. Brown's stepson appeared at Mr. Brown's mother's door and Mr. Brown welcomed his stepson into the apartment. Accordingly, the trial court correctly denied Mr. Brown's motion to continue, and summary judgment in favor of Ms. Hotard was appropriate. See LSA-C.C.P. art. 966(C)(2); **Fredericks**, 906 So.2d at 640-41.

## CONCLUSION

For the foregoing reasons, the October 12, 2023 judgment of the trial court granting summary judgment in favor of Tammy Hotard, and dismissing the claims asserted by Brandon Brown against Tammy Hotard, is affirmed. Costs of appeal are assessed to Brandon Brown.

**AFFIRMED.**

12