# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2025 CA 0019

## LINDA WESSINGER

### VERSUS

### JOHN MORRIS IN HIS OFFICIAL CAPACITY AS MAYOR OF TOWN OF WHITE CASTLE AND THE TOWN OF WHITE CASTLE, LOUISIANA, AND MARIO BROWN IN HIS OFFICIAL CAPACITY AS THE CHIEF OF POLICE OF THE TOWN OF WHITE CASTLE AND SHARMEL LEWIS AND KADARIUS FOSTER

*Judgment Rendered:* **OCT 2 9 2025**

********

18th Judicial District Court
In and for the Parish of Iberville
State of Louisiana
Suit No. 79786

The Honorable Elizabeth A. Engolio, Judge Presiding

********

Charlotte C. McDaniel
Baton Rouge, Louisiana

Keith M. Detweiler
Metairie, Louisiana

Counsel for Plaintiff/Appellant
Linda Wessinger

Counsel for Defendants/Appellees
The Town of White Castle, Mayor
John Morris, and Chief of Police
Mario Brown

********

BEFORE: McCLENDON, C.J., LANIER, WOLFE, BALFOUR, AND FIELDS, JJ.

McClendon, J., dissents in part and assigns reasons.

**LANIER, J.**

Plaintiff, Linda Wessinger, appeals a judgment of the trial court that granted a motion for summary judgment filed by three defendants, John Morris, in his official capacity as Mayor of the Town of White Castle ("Mayor Morris"); the Town of White Castle ("the Town"); and Mario Brown, in his official capacity as the duly elected Chief of Police of White Castle ("Chief Brown"). For the reasons that follow, we affirm as to the Town and Mayor Morris, and we reverse as to Chief Brown.

## FACTS AND PROCEDURAL HISTORY

Ms. Wessinger filed suit against the defendants, Mayor Morris, the Town, Chief Brown, Sharmel Lewis, and Kadarius Foster, seeking damages arising out of a physical altercation that took place in the parking lot of the White Castle Community Center ("Community Center"). The Town is the owner of the Community Center and collects rental payments for the use of the facility. According to the petition, Ms. Wessinger and her daughter, Catelynn Williams, attended an "All White Party" at the Community Center with other invited guests in August 2019. Ms. Wessinger alleged that as she and Catelynn were attempting to leave the party, she was confronted by Ms. Lewis. Ms. Wessinger asserted that when Catelynn intervened on her, an altercation ensued between Catelynn and Ms. Lewis. When Ms. Wessinger attempted to stop the fight, Mr. Foster stepped in and pushed Ms. Wessinger to the ground, causing her to sustain injuries.[1] Ms. Wessinger alleged that her injuries were caused by the intentional acts of Ms. Lewis and Mr. Foster and by a breach of duty owed by Mayor Morris, Chief Brown, and the Town (sometimes collectively referred to as the "White Castle defendants") in failing to provide security for the party as was required by the rental agreement in place for the event.

---

[1] According to the record, Ms. Lewis is Mr. Foster's aunt.

In response to Ms. Wessinger's petition, the White Castle defendants filed a motion for summary judgment, asserting there was no genuine issue of material fact with respect to liability because of Ms. Wessinger's inability to prove that the White Castle defendants owed a duty to protect her from the unforeseeable acts of Ms. Lewis and Mr. Foster. The trial court held a hearing on the motion on March 28, 2024, following which it granted summary judgment in favor of the White Castle defendants. The trial court signed a judgment on April 10, 2024, granting the motion and dismissing, with prejudice, all of Ms. Wessinger's claims against the White Castle defendants.[2] Ms. Wessinger filed a timely motion for new trial, which was denied by the trial court on July 10, 2024. Ms. Wessinger appealed that judgment on July 22, 2024.

We consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits when it is clear from the appellant's brief that she intended to appeal the underlying judgment. **Miller v. Albertson's Companies, LLC**, 2023-0527 (La. App. 1 Cir. 12/27/23), 381 So.3d 84, 88. It is obvious from Ms. Wessinger's brief that she intended to appeal the summary judgment. Thus, we will treat this appeal as an appeal of the April 10, 2024 summary judgment.

**SUMMARY JUDGMENT**

Appellate courts review the grant or denial of summary judgment *de novo* under the same criteria governing the trial court's consideration of whether summary judgment is appropriate. **Robinson v. Cheng, LLC**, 2022-1130 (La. App. 1 Cir. 7/10/23), 372 So.3d 7, 9. A court shall grant summary judgment if the motion, memorandum, and supporting documents show there is no genuine issue of material

---

[2] According to the record, Ms. Wessinger filed a motion for preliminary default against the remaining defendants, Ms. Lewis and Mr. Foster, on December 4, 2020. There is no default judgment in the record before us. However, at the end of the summary judgment hearing, counsel for Ms. Wessinger advised the trial court as follows: "[T]here are two defendants that are left ... who have both been served, never answered. I took a preliminary default. I did not have a final default." Nonetheless, this appeal does not pertain to the claims against either of these defendants.

3

fact and that the movant is entitled to judgment as a matter of law. See La. Code Civ. P. art. 966(A)(3).

The summary judgment movant maintains the burden of proof. Nevertheless, if the movant will not bear the burden of proof at trial on the issue before the court on the motion, his burden is satisfied by pointing out an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. See La. Code Civ. P. art. 966(D)(1). Thereafter, the adverse party must produce factual support sufficient to establish he will be able to satisfy his evidentiary burden at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and if appropriate, the court shall render summary judgment against him. See La. Code Civ. P. arts. 966(D)(1) and 967(B); **Robinson**, 372 So.3d at 9. A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of a legal dispute. **Smith v. Our Lady of the Lake Hosp., Inc.**, 93-2512 (La. 7/5/94), 639 So.2d 730, 751. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. *Id.* Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Johnson v. Knight**, 2023-1267 (La. App. 1 Cir. 6/14/24), 391 So.3d 1126, 1129.

The claims by Ms. Wessinger in this case are based, in part, on the White Castle defendants' alleged negligence. Ms. Wessinger alleges the White Castle defendants owed her a duty to protect her from the injuries she sustained during the altercation. She asserts that the rental agreement entered into by the Town and Ursula Smith, the person who hosted the party on the night in question, resulted in an assumed duty on the part of the White Castle defendants to provide security. Ms. Wessinger maintained this was a duty created by contract.

4

Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under general negligence principles.  See **Lemann v. Essen Lane Daiquiris, Inc.**, 2005-1095 (La. 3/10/06), 923 So.2d 627, 632-633.  For liability to attach under a duty-risk analysis, a plaintiff must prove: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).  **Bass v. Disa Global Solutions, Inc.**, 2019-1145 (La. App. 1 Cir. 6/12/20), 305 So.3d 903, 907, writ denied, 2020-01025 (La. 11/4/20), 303 So.3d 651.  A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. **Cantrelle v. Lafourche Parish Council**, 2021-0678 (La. App. 1 Cir. 2/1/22), 340 So.3d 1059, 1073.

*__Summary Judgment Evidence__*

In support of the motion for summary judgment, the White Castle defendants submitted Mayor Morris' affidavit, along with copies of receipts issued by the Town to Ms. Smith in connection with her rental of the Community Center.  Also attached to Mayor Morris' affidavit was an unverified copy of a blank rental agreement with the words "REVISED DECEMBER 2019" typed in the top left-hand corner of the document ("rental agreement").  The White Castle defendants also submitted the depositions of Mayor Morris and Ms. Wessinger in support of their motion.[3]

---

[3] In addition to this evidence, the White Castle defendants attempted to introduce a video that purported to show the altercation in question.  However, the trial court excluded the video following an objection by Ms. Wessinger.

The only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, certified copies of public documents or public records, certified copies of insurance policies, authentic acts, private acts duly acknowledged, promissory notes and assignments thereof, written stipulations, and admissions. La. Code Civ. P. art. 966(A)(4). Documents that are not included in the exclusive list, such as photographs, pictures, video images, or contracts, are not allowed to be filed unless they are properly authenticated in a deposition or affidavit to which they are attached. See La. Code Civ. P. art. 966, Comments–2015, comment (c); **Loupe v. Roman Catholic Church of Diocese of Baton Rouge**, 2022-1153 (La. App. 1 Cir. 4/14/23), 365 So.3d 844, 848, writ denied, 2023-00758 (La. 10/10/23), 371 So.3d 458. Nevertheless, it has been recognized that although Articles 966 and 967 do not permit a party to use unsworn and unverified documents as summary judgment evidence, if both parties offer identical copies of documents, indicating that there is agreement between them as to their authenticity, the court may accept them. See **Boland v. West Feliciana Parish Police Jury**, 2003-1297 (La. App. 1 Cir. 6/25/04), 878 So.2d 808, 814, writ denied, 2004-2286 (La. 11/24/04), 888 So.2d 231.

While the rental agreement attached to Mayor Morris' affidavit was not a certified copy as is required by Article 966 and would normally not be allowed to be considered as competent summary judgment evidence, we note that Ms. Wessinger submitted a copy of the identical rental agreement in opposition to the motion for summary judgment. Thus, the authenticity of the document is admitted by the parties and properly considered in this case.

The rental agreement provides as follows with regard to security for events at the Community Center:

6

**Security**

- ❖ At least one (1) White Castle Police Officer per 150 persons in attendance is required to provide security for events. Assignment of this officer by the Chief of Police is required for any function where alcohol will be served. Security for other events can be used by the lessee, with the permission of Chief of Police. It shall be the sole responsibility of the Lessee to obtain and bear the additional costs for proper security and law enforcement personnel for crowd control.

- ❖ The fee for providing security for events is One Hundred Twenty Dollars and 00/100 ($120.00)/hour per officer for a minimum of 4 hours.

- ❖ A separate security money order made payable to the White Castle Police Department must be provided to the Chief at least seven (7) days prior to the event. Failure to provide payment or proof of security will automatically cancel the event.

In another section entitled "**Adult Functions**," the rental agreement provides that "[a]t least one (1) White Castle Police Officer, appointed by the Chief of Police, is required to provide security for events." Moreover, there is a signature page at the end of the agreement for the Chief of Police, which appears in the rental agreement as follows:

*Approval of Chief of Police (Adult Functions Only)*

Proof of required Licenses/Permits provided? ☐ Yes ☐ No  _____
*License/Permit #s*

*Event Occupancy (_____)*

_____ *Cost per hour One Hundred Dollars and 00/100 ) x_____ hours (per 150 attendees) Total Cost $_____*
Officer

*Additional Officer(s)*

_____*Cost per hour $_____ x_____ hours (per 150 attendees) Total Cost $_____*
Officer

_____*Cost per hour $_____ x_____ hours (per 150 attendees) Total Cost $_____*
Officer

Total Security Cost $_____
*By*_____
Mario Brown, Chief of Police

In his deposition testimony, Mayor Morris acknowledged that he had seen the original agreement signed by Ms. Smith in connection with the party in question. He noted that although he did not have the original agreement with him at the time, it was "not missing." Mayor Morris further explained that there had been some reorganization and renovation, but they were "looking for [the original agreement]." When asked if he would produce the original agreement to his attorney, Mayor Morris replied, "Yes, I will. There's nothing to hide." Mayor Morris acknowledged

the rental agreement contains signature pages. However, he indicated that in response to past inquiries as to whether the agreement was to be signed by the mayor or by a council member, his reply was "It's either/or." Concerning Ms. Smith's rental, Mayor Morris further indicated that everything had been done properly to secure the Community Center for the party in question and that all funds had been paid.

Subsequently, in his December 4, 2023 affidavit, Mayor Morris maintained that the Town was unable to locate the agreement signed by Ms. Smith. However, he attested that the rental agreement attached to his affidavit was identical to the agreement used in this case and further referenced the receipts issued to Ms. Smith, which reflected the payments she made for the rental of the Community Center.

Mayor Morris explained that in order to rent the Community Center, an interested party would have to meet with either the Town clerk or an assistant clerk to get a contract in place and pay a deposit for the building. Mayor Morris noted further that pursuant to the agreement, Ms. Smith was required to pay a fee for one security guard to be furnished by the White Castle Police Department.

According to Mayor Morris, he attended the party at the Community Center. When asked if he saw a police officer on duty that night, Mayor Morris stated, "Yes, I saw when one walk in, and then walk right back out." Mayor Morris explained that when on duty, the officers are not required to stay inside the Community Center the entire time; rather, they are to stay on the premises and can at times be in "their unit or making circles in the parking lot as well." Mayor Morris was unaware of the name of the officer who was assigned as security, stating, "We're not responsible for the name of that officer. We get the security deposit, but then that's at the ability of the [Chief of Police] who he provides." Mayor Morris testified further that security is there "to make sure everything stays in order inside that building." He agreed that an altercation would be a breach of order. When asked if alcohol was served at the

8

party in question, Mayor Morris responded, "I believe it was a bring your own bottle affair." He added that upon rental, the Town inquires about alcohol service/selling, noting that a permit from the state is required for such activity.

Concerning the altercation, Mayor Morris stated that he was inside the building as the altercation occurred outside. He was asked if he knew "whether a security officer or security detail had to be called or dispatched to that location because of an altercation," to which he replied, "Not at that moment." It was only after Mayor Morris "saw [police unit] lights outside" that he realized the police had been called. When asked if he went outside to get a status as to why the police were there, Mayor Morris responded, "Not my job." Prior to leaving the Community Center that evening, Mayor Morris did speak with Officer Ronald K. Jones, the investigating officer.

When questioned during her deposition about the altercation, Ms. Wessinger stated that at some time prior to the night in question, she and Ms. Lewis had exchanged words over the phone about Ms. Lewis' boyfriend. They had not seen each other in person since that phone call until the night in question when she was confronted by Ms. Lewis. Ms. Wessinger indicated she did not speak with either Ms. Lewis or Mr. Foster at the party and denied knowing of "any bad blood" between them at the time.

Ms. Wessinger explained that just prior to the altercation, she and Catelynn were leaving the party and Della Lewis, Ms. Lewis' sister, was walking them to the door. According to Ms. Wessinger, Catelynn told her to "walk up" because Ms. Lewis was approaching quickly from behind. When Ms. Wessinger turned around, Ms. Lewis said to her, "What's up, B? You got something to say?" Not wanting "any drama," Ms. Wessinger replied, "I'm not here for foolishness." Ms. Wessinger explained that as they were walking out of the building, Ms. Lewis used a different

9

door to exit the building so that she would be in front of Ms. Wessinger. Ms. Wessinger further described the events as follows:

[S]o I turned around and I was walking away. So when I walked away, she was coming behind me, and my daughter saw her and my daughter was like, "Oh, I can't let you fight my mama. I'm not about to let you fight my mama." So that's when [Ms. Lewis] told her, "B, if you don't get out my way," and that's when [Ms. Lewis] ran into my daughter. She just started fighting my daughter.

When asked what happened next, Ms. Wessinger stated, "I run over there to ... try and break them up, and as soon as I get over there, I hadn't even got [sic] a chance to stop them. [Mr. Foster] said, 'No, B, get away from my auntie,' and he pushes me ... [and] I go flying across the street."

After the altercation was over, Ms. Wessinger and Catelynn headed towards their vehicle to leave. At some point before they left the premises, Ms. Wessinger got out of the vehicle to talk to a police officer who was there. Ms. Wessinger did not know the officer or his name. According to Ms. Wessinger, she told the officer her version of the events after which the officer went in the Community Center to find Ms. Lewis. When the officer came back, he indicated that Ms. Lewis was no longer there and that he would need to talk to Ms. Lewis before he could do anything else. Ms. Wessinger noted that Della was also trying to tell the officer about the altercation, but he was not listening to her. Ms. Wessinger indicated she was never asked by the officer to give a statement, nor was she ever contacted by the police again.

In opposition to the motion for summary judgment, Ms. Wessinger asserted that the White Castle defendants could not establish with sufficient evidence that they complied with the obligation to provide security. She alleged that the duty to provide security was assumed by the White Castle defendants through the rental agreement and that summary judgment was not proper because material issues of fact remained. In support of her opposition, Ms. Wessinger submitted a copy of the

same rental agreement offered by the White Castle defendants; the affidavits of Ms. Wessinger and Catelynn; the depositions of Mayor Morris, Chief Brown, Ms. Lewis, Officer Jones, and Monica Hamilton Lee (the Town clerk); and the unverified responses by the White Castle defendants to various discovery requests by Ms. Wessinger.

Pursuant to La. Code Civ. P. art. 966(D)(2), "[t]he court shall consider only those documents filed or referenced in support of or in opposition to the motion for summary judgment but shall not consider any document that is excluded pursuant to a timely filed objection." We note that no objections were made by the White Castle defendants regarding any of the documents attached to Ms. Wessinger's opposition. However, Ms. Wessinger submitted responses to requests for production of documents, which items are not listed as proper summary judgment evidence under Article 966(A)(4), and answers to interrogatories, which were not answered under oath as is required by La. Code Civ. P. art. 1458. See La. Code Civ. P. art. 966, Comments–2015, comment (c) ("Article 1458 requires that interrogatories be answered under oath, and only answers that are made under oath may be filed in support of or in opposition to a motion for summary judgment.") After reviewing the evidence submitted by Ms. Wessinger, we find that the responses to requests for production of documents and the answers to interrogatories are not proper summary judgment evidence. These documents are unsworn and unverified and have no evidentiary value. See **Lucas v. Maison Insurance Co.**, 2021-1401 (La. App. 1 Cir. 12/22/22), 358 So.3d 76, 89.

According to both Ms. Wessinger and Catelynn, there was no security or police presence at any time during the party at the Community Center. They both indicated that the only police officer they saw that night was the one who arrived in a police vehicle after midnight, once the altercation was over. Contrary to these statements, Ms. Lewis recalled there being police on the scene as the altercation was

ongoing. When asked if there were police there when the fight started, Ms. Lewis stated, "Yeah, the police was there." She described police cars sitting outside the second exit of the Community Center. When asked how many police cars were there, the following colloquy occurred:

A. If I'm not mistaken, I think it was two. And I think one of them has orange writing on it because that's Plaquemine and I think it was one of the White -- White Castle police cars. And I'm going to tell you how I know the police was there. Because when I walked out of the gym to go to fight with Linda, the police car was there. That's why I went to the side where she was at.

Q. Okay. So, when you walked out the gym, you saw two police cars, one of them was orange and one of them was a --

A. When I said orange, I think they had orange writing on it because there was two. You know how the police cars sit, the lights -- the sirens are not on, but they just have this blue light just sitting still, just a light just sitting, you know, that ... acknowledges that ... the police car is there? You know what I mean? The sirens are not on, the lights are not blinking, it's just a blue light that they have on.

Q. Okay. So, you said that, if you can remember, there were two police cars --

A. Yeah.

Q. -- one had orange writing on it --

A. Orange writing on it, yeah, and --

Q. -- and a blue light?

A. The orange writing is -- that's an Iberville car. That's a Plaquemine car.

Q. Okay. And what about --

A. And then, there was another one right across from it, I think it was. I think that was a White Castle police car. Don't quote me on that, but I tell you this, there was a police car there because just like I said, when Linda walked out that door and I walked out behind her, I didn't tell her nothing in front of that building because I saw the police right there. That's why it happened kind of like on the side.

Q. So, to clarify, and I want to make sure that I'm absolutely clear on this, you saw no one in a police uniform on the inside of the building; is that correct?

A. I never said that and you never asked me that.

12

Q.   Okay. So, I'm asking. You never saw a police officer in uniform inside the building the night of the party, did you?

A.   I didn't say I did and I didn't say I didn't. I don't remember if I saw police in there.

Ms. Lewis continued, noting that while she was at the Community Center, her main concern was the animosity that had been brewing between her and Ms. Wessinger, stating, "my main focus, when I got there and I saw Linda, she said when she seen me she was going to whip my f------ ass and that's what I wanted her to do. So, that's why when I saw her went [sic] out the door, that's why I ran behind her." Ms. Lewis' description of the altercation was very similar to that of Ms. Wessinger. However, when she was asked about who "was trying to break up the fight," Ms. Lewis indicated that she saw a uniformed, black male police officer standing behind her. She further added, "[T]here was so many people out there. Even the police was standing behind when I did look. They had a police there." Ms. Lewis expressed her concern for being arrested and taken to jail, adding that she did not stay around to find out the officer's name.

According to Officer Jones' deposition testimony, he was on routine patrol the night of the incident when he was called to the scene by dispatch.[4] He did not have his lights or siren activated when he arrived. Officer Jones was unaware of who was working security that night at the Community Center and did not speak to another officer or see any other officer dressed in uniform that night. He never went into the Community Center that night as part of his investigation. Officer Jones recalled seeing several people outside, which he knew was not allowed, and attempted to clear the area.

As Officer Jones was trying to get everyone back inside the Community Center, he heard yelling coming from behind him. He approached a white vehicle

---

[4] At the time of trial, Officer Jones had been promoted to First Sergeant.

and observed a young black female sitting in the front seat trying to get out of the vehicle. Officer Jones was then approached by Ms. Wessinger, who told him that she wanted Ms. Lewis arrested because Ms. Lewis had broken Ms. Wessinger's wrist. He advised Ms. Wessinger that he would need a statement from her in order to complete his report so that Ms. Wessinger could file charges against Ms. Lewis if she desired. He also told Ms. Wessinger, "if one person gets arrested, then the other person will get arrested, too .... It takes two to fight." When Officer Jones returned to the station after the incident, Mayor Morris told him that "this has been going on - been brewing for months" and that Mayor Morris had been advised that Ms. Wessinger and Catelynn had jumped Ms. Lewis.

When asked if he had ever worked security details at the Community Center, Officer Jones indicated he had. Officer Jones testified further about the process of working such details as follows:

> Q.     Well, okay, it may be confusing. How would you get on a team? Would you volunteer? Did somebody call you up and say you're on the team, or how did you get on it?

> A.     Usually ... whoever rents the [C]ommunity [C]enter, they'll tell how many officers they need. The [T]own clerk would then contact the secretary of the chief, and then if you're off that day, he'd ask you, you know, hey ... do you want this detail. If not, then you don't have to take it.

> Q.     Okay. So, when it was offered to you, it was [a] voluntary thing, want to make some extra money, [if] you're available?

> A.     Correct.

> Q.     Assuming you served on a detail, how did you get paid?

> A.     It depends. Sometimes we get paid cash. Sometimes they'd leave the money order with the [T]own clerk, and she'd bring it over to the police department. And then, she'd have our names on an envelope.

At the time of her deposition, Monica Hamilton Lee had worked for the Town for 33 years, spending the last 12 years as Town clerk. Ms. Lee indicated that she searched her paper files in an attempt to locate the original rental agreement that Ms.

Smith signed for the rental of the Community Center. However, she was unable to find the document. Nonetheless, Ms. Lee was familiar with the rental agreement submitted into evidence by the parties, noting that the only thing that really changed with the agreement over the years was the price for security. Ms. Lee testified that in 2019, the security fee was $120.00 for four hours, whereas at the time of her deposition in 2024, the fee was $160.00 for four hours. She verified the receipts that she completed concerning Ms. Smith's rental of the Community Center, adding that in addition to the $120.00 security fee, the rental fee was $350.00. When asked if Ms. Smith was issued a refund for either the security fee or the rental of the Community Center, Ms. Lee responded, "None at all."

Ms. Lee explained that she did not know who was assigned to work security on the night in question. She indicated she did not know who assigned the security detail, adding "It just goes through the White Castle Police Department." Ms. Lee stated she had no knowledge of who actually insured the police officers were paid for the security details. She further described her involvement in that process as follows, "[I collect] the money, drop it off [at the police department] and it's out of my hand[s]." Ms. Lee indicated that security fees are always paid with money orders and that the "Pay to" line is left blank. Once the money order is routed to the officer who worked the detail, the officer can then fill in the money order to receive payment.

In a more detailed discussion about the terms of the rental agreement, the following exchange took place between Ms. Lee and counsel for Ms. Wessinger:

> Q. The sixth ... bullet point down, under "Adult functions: At least one White Castle police officer appointed by the Chief of Police is required to provide security for events," adult functions.
>
> Is that provision not enforced against the chief of police?
>
> . . . .
>
> A. I don't know.

15

. . . .

Q.    You, it says pretty clearly that he's the one that appoints the police officer, correct?

A.    That's what it says in the contract. But I don't know.

Q.    You don't know if he follows it?

A.    I don't know.

. . . .

Q.    Actually, there's also a signature line for Mario Brown, Chief of Police where the officer, there's a blank for the officer. I don't know if that's where the name of an officer's filled in or the title of an officer's filled in. Do you know?

A.    They barely -- he barely does that. We don't even fill this part here out.

Q.    No, I'm not saying you fill it out, but you maintain this document after it is filled out, right?

A.    Yes, but we don't -- I really don't get him to fill that out. I don't get him to fill that out.

Q.    Are you -- you're the custodian of this document and you're the intake person for anybody who wants to rent the [C]ommunity [C]enter. Are you not familiar with what the police chief does with this document once it goes to his office?

A.    It doesn't go to his office. It just stays in my office.

Q.    It stays in your office. Well ... when does Mario sign as the chief of police?

A.    He doesn't sign it. I just -- like I say, I bring the money out over there to them and let them know they needed an officer and they get the officer. I mean, that's it.

Q.    Does Mario Brown sign this document --

A.    No, he doesn't.

Q.    -- on page 7? Yes or no?

A.    No, he doesn't.

. . . .

16

Q. Okay. Does the name of an officer who's going to be a special duty officer, is it on that form or not?

A. No, sir.

Q. No. Does the mayor sign the rental agreement?

A. No, sir.

Q. Does an alderman sign the rental agreement?

A. No, sir.

Q. Who signs? Just the person renting?

A. The lessee renting it. Just sometimes we don't -- they don't really come into the office. Sometimes they sign, sometimes they don't.

In his deposition testimony, Chief Brown indicated that he has nothing to do with the rental of the Community Center. Rather, Chief Brown stated the contracts are handled by the Town clerk or the mayor. When shown the place on the rental agreement where he should have signed as Chief of Police and asked if he is the one who assigns the security, Chief Brown testified as follows:

Q. But that form has a place for you to sign as Chief of Police. Are you the one who assigns the security detail work?

. . . .

[A.] No, that's personal with those officers ... that's something the rental paid, it's not a contract with me or whatever. But I rarely have signed these .... That was between whoever, the officer or whoever takes it, and ... the [renter]. Now, I'm not sure where they are officers or whatever they were working a security, but I don't have, I don't say you, you, you, you.

Q. Well, if you get a ... call from the [T]own clerk or the mayor saying we need ... security for an event, that is your responsibility to put the security together, correct? ... Well ... who does that? Does the mayor assign the policeman?

A. No ... it's not assigned ... if that takes a detail ... which we call it a detail ... that's them and their contract between them and the renter, as I told you before.

. . . .

Q. [O]n this page seven where it has a place for you to sign the document, it says approval of Chief of Police, adult functions only. Mr. Brown ... didn't you generally sign [for] each special event?

A. No, sir.

Q. You didn't sign them?

A. No, sir.

Chief Brown was emphatic that he never assigned officers to details, adding, "I can't make them." He explained that the details are "an off duty thing" and that he would ask if any of the officers were interested in working the detail. Chief Brown stated that his officers were required to have their badge on as identification when working a detail and that depending on the type of event, the officer may wear a uniform. When asked about the night in question and whether he knew if there was anyone on security detail, Chief Brown noted he did not attend the party and does not keep a list of the officers who volunteer for details.

***Summary Judgment in favor of the Town and Mayor Morris***

The trial court granted summary judgment in favor of the Town and Mayor Morris and dismissed, with prejudice, all of Ms. Wessinger's claims against them. In oral reasons for judgment, the trial court concluded that because the acts of Ms. Lewis and Mr. Foster were intentional, criminal, and unforeseeable, the White Castle defendants did not owe Ms. Wessinger a duty. Concerning the trial court's dismissal of Ms. Wessinger's claims against the Town and Mayor Morris, we agree that summary judgment was appropriate as against these parties. However, we affirm this portion of the trial court's April 10, 2024 judgment, not for the reasons given by the trial court, but because we find that the Town and Mayor Morris satisfied the duty owed to Ms. Wessinger.

The law recognizes that a property owner has a general duty relative to the safety of persons on his premises to exercise reasonable care and not to expose such persons to unreasonable risks of injury or harm. **Mundy v. Department of Health**

18

**& Human Resources**, 620 So.2d 811, 813 (La. 1993). As previously noted, the rental agreement[5] required the lessee pay a fee to obtain security for any adult function, *i.e.*, "[a]t least one (1) White Castle Police Officer, appointed by the Chief of Police." Moreover, the undisputed evidence bears out that in this case, Ms. Smith paid a rental fee of $350.00 and a security fee of $120.00. Because the contract terms required security for the event, the Town and Mayor Morris had no further duty to Ms. Wessinger.

Whether there was negligence in how the security was carried out is not a burden to be borne by the Town and Mayor Morris. Rather, this burden falls to the provider of said security, Chief Brown. The Town and Mayor Morris assumed no responsibility with regard to how the security would be carried out. Moreover, there can be no finding of liability on their part if the security that Ms. Smith obtained and paid for through the White Castle Police Department was not present at the party as was required by the agreement. Accordingly, summary judgment in favor of the Town and Mayor Morris is appropriate, and we affirm the dismissal of Ms. Wessinger's claims as against the Town and Mayor Morris.

### *Summary Judgment in favor of Chief Brown*

As previously noted, the trial court granted summary judgment in favor of Chief Brown finding that Chief Brown owed no duty to Ms. Wessinger under the facts and circumstances of this case because of the unforeseeable intentional and criminal acts of Ms. Lewis and Mr. Foster. On appeal, Ms. Wessinger argues that summary judgment was granted in error and that the question is whether the White Castle Police Department breached its duty to perform the security services in a non-

---

[5] Although Ms. Wessinger argues on appeal that the failure of the White Castle defendants to produce a signed copy of the original agreement entered into by Ms. Smith and the Town creates a genuine issue of material fact, we find no merit to this argument. As previously noted, the parties have admitted to the authenticity of the rental agreement that was submitted into evidence in this case.

19

negligent manner. She further argues that summary judgment was not appropriate as there are genuine issues of material fact remaining as to whether security was even present on the night in question. We find merit to Ms. Wessinger's arguments regarding the summary judgment granted in favor of Chief Brown.

Pursuant to Louisiana statutory law and jurisprudence, a police officer is a person who has been authorized and empowered by a governmental entity to perform duties that relate to the governmental function of maintaining peace and order. See **Herrera v. First Nat. Ins. Co. of America**, 2015-1097 (La. App. 1 Cir. 6/3/16), 194 So.3d 807, 815, writ denied, 2016-1278 (La. 10/28/16), 208 So.3d 885. The peacekeeping aspect of a police officer's duties includes routine patrolling, investigating, and answering of emergency calls. Along with the duty to maintain peace and order, a police officer has a duty to prevent crime, enforce the law, and protect the citizenry. **Herrera**, 194 So.3d at 815; see also La. R.S. 40:2402(3)(a).

Thus, a police officer has a duty to the public that arises from a social contract that confers upon him the authority to enforce the laws of the city and state within his jurisdiction and subject to the order of his superior officers. **Dyer v. City of New Orleans**, 96-2802 (La. App. 4 Cir. 8/20/97), 700 So.2d 866, 869, writ denied, 97-2347 (La. 11/26/97), 703 So.2d 650. Law enforcement officers have a duty to act reasonably to investigate possible violations of the law and to protect citizens who may be harmed by a violation. **Hardy v. Bowie**, 98-2821 (La. 9/8/99), 744 So.2d 606, 614, abrogated on other grounds by **Gregor v. Argenot Great Cent. Ins. Co.**, 2002-1138 (La. 5/20/03), 851 So.2d 959. This authority must at all times be exercised in a reasonable fashion, and the officer must act as a reasonably prudent man under the circumstances; thus, police officers are held to choosing a course of action that is reasonable under the circumstances. *Id.*; see also **Syrie v. Schilhab**, 96-1027 (La. 5/20/97), 693 So.2d 1173, 1177. Generally, this same duty applies to off-duty police officers working a private detail if they are primarily performing the

duties of a police officer or are within the scope of their employment because they are actively engaged in police work or performing some action furthering the police function. See **Blair v. Tynes**, 621 So.2d 591, 595-596 (La. 1993); **Cheatham v. Lee**, 277 So.2d 513, 516 (La. App. 1 Cir.), writ denied, 279 So.2d 696 (La. 1973).

We note, once again, that the rental agreement required one security guard, appointed by Chief Brown, to provide security for Ms. Smith's event at the Community Center. Although Mayor Morris remembered seeing a police officer "walk in, and then walk right back out" of the Community Center on the night of the party, no other witness testified to seeing any police presence inside the Community Center that night. Furthermore, when Officer Jones arrived on the scene, he did not see or speak to any other uniformed police officer about the incident. We note that Ms. Lewis did testify that the police were there when the fight started and that she purposefully avoided two police vehicles parked outside of the Community Center as she was following Ms. Wessinger out of the building. However, it is unclear from Ms. Lewis' testimony if she is actually referring to an officer being present when the altercation began or if it was simply the police cars that she was trying to evade as she was exiting the Community Center. Moreover, Ms. Lewis' reference to a uniformed, black male police officer standing behind her as the altercation was taking place is not dispositive of the issue of whether security was present. The record is devoid of any information concerning the investigating officer other than his name, leaving open the possibility that the officer Ms. Lewis saw at that point of the night was, in fact, Officer Jones, the officer who was dispatched to investigate the incident.

Based on our *de novo* review of the record before us and the applicable jurisprudence, summary judgment in favor of Chief Brown was inappropriate. We find that Chief Brown owed a duty to Ms. Wessinger to provide security per the contract that was reasonable under the circumstances. Genuine issues of material

21

fact remain as to whether a White Castle officer was in fact present during the party and whether, if present, the officer performed his duty to provide security in a reasonable manner. We reverse that portion of the judgment dismissing Ms. Wessinger's claims against Chief Brown and remand for further proceedings.

## CONCLUSION

For the above and foregoing reasons, we affirm that portion of the trial court's April 10, 2024 judgment that granted summary judgment in favor of John Morris, in his official capacity as Mayor of the Town of White Castle, and the Town of White Castle and dismissed Linda Wessinger's claims against Mayor Morris and the Town of White Castle. We reverse that portion of the trial court's April 10, 2024 judgment that granted summary judgment in favor of Mario Brown, in his official capacity as the duly elected Chief of Police of White Castle, and dismissed Linda Wessinger's claim against Chief Brown. We remand the matter for further proceedings. All costs associated with this appeal are assessed against appellee, Chief Brown.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

**STATE OF LOUISIANA**

**COURT OF APPEAL**

**FIRST CIRCUIT**

**2025 CA 0019**

**LINDA WESSINGER**

**VERSUS**

**JOHN MORRIS IN HIS OFFICIAL CAPACITY AS MAYOR OF TOWN AND OFFICIAL CAPACITY AS OF WHITE CASTLE AND THE TOWN OF WHITE CASTLE, LOUISIANA, AND MARIO BROWN IN HIS OFFICIAL CAPACITY AS THE CHIEF OF POLICE OF THE TOWN OF WHITE CASTLE AND SHARMEL LEWIS AND KADARIUS FOSTER**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**McClendon, C.J., dissenting in part.**

I agree with the trial court's grant of summary judgment in favor of Mayor Morris and the Town of White Castle. However, I disagree with the majority's decision to reverse that part of the trial court's summary judgment in favor of Chief Brown.

The duty to protect patrons from criminal acts only arises under limited circumstances, when the criminal act in question is reasonably foreseeable. **Posecai v. Wal-Mart Stores, Inc.**, 99-1222 (La. 11/30/99), 752 So.2d 762, 766; **Brown v. England, L.P.**, 2024-0264 (La.App. 1 Cir. 9/26/24), 405 So.3d 766, 771. It is only when the proprietor has knowledge of, or can be imputed with knowledge of, the third party's intended conduct that the duty to protect is invoked. **Brown**, 405 So.3d at 771.

In this matter, Ms. Wessinger offered no evidence as to foreseeability, and, in fact, submitted in opposition to the motion for summary judgment, the deposition testimony of Ms. Lewis, wherein Ms. Lewis stated that she walked out of the side door of the gym to fight Ms. Wessinger to avoid the police car in front of the building. Ms. Wessinger also testified in her own deposition that she had no idea that Ms. Lewis was thinking of confronting her at the party.

Accordingly, I respectfully dissent in part.